ERHARD SEMINARS TRAINING, A CALIFORNIA CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; TWINE, INC., A CALIFORNIA CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Erhard Seminars Training v. Commissioner
Docket Nos. 6283-75, 9220-76, 6249-78, 820-79, 4857-80, 1408-81.
United States Tax Court
T.C. Memo 1986-526; 1986 Tax Ct. Memo LEXIS 80; 52 T.C.M. (CCH) 890; T.C.M. (RIA) 86526; October 23, 1986. Jay T. Youngdahl and Arthur Sadin, for the petitioner. Stephen M. Miller, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: These consolidated cases were assigned for trial or other disposition to Special Trial Judge James M. Gussis pursuant to section 7456(d) and Rule 180, et seq. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GUSSIS, Special Trial Judge: Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax under section 6653(a), Internal Revenue Code of 1954, as follows: Taxable
Addition
Docket
Year
Income Tax
to Tax
Number
Ended
Petitioner
Deficiency
Sec. 6653(a)
6283-75
4/30/72
ERHARD SEMINARS TRAINING,
$120,013.00
$6,001
A California Corporation
9220-76
4/30/73
ERHARD SEMINARS TRAINING,
525,167.00
26,258
A California Corporation
6249-78
4/30/74
Twine, Inc.
303,608.00
15,180
820-79
4/30/75
Twine, Inc.
391,152.00
19,558
4857-80
4/30/76
Twine, Inc.
779,232.32
1408-81
4/30/77
Twine, Inc.
187,084.00
*82 The partnership issues involved in the taxable years ended April 30, 1975 through 1977 (Twine, Inc.) have been severed by Order of this Court. The partnership issues are the subject matter of a proceeding before another Division of this Court and the parties here agree that the holding of the Court in such other proceeding with respect to the partnership issues will be binding and dispositive of the partnership issues here involved. Respondent has stipulated concessions with respect to the taxable years ended April 30, 1972 through April 30, 1975 which will be given effect in the Rule 155 computation. Petitioner failed to present evidence or argument with respect to several issues which must therefore be deemed conceded.The remaining issues in these consolidated cases are (1) whether petitioner is entitled to amortization deductions with respect to a license for the use of the "Body of Knowledge" in each of the taxable years ended April 30, 1972 through 1976; (2) whether petitioner is entitled to interest expense deductions in excess of the amounts allowed in each of the taxable years ended April 30, 1972 through 1975 and for the taxable year ended April 30, 1977; (3) whether *83 petitioner is entitled to deductions under section 162 for travel and entertainment expenses in excess of the amounts allowed in the taxable years ended April 30, 1973 and 1974; (4) whether petitioner is entitled to deductions under section 162 for food and beverage expenses incurred in the taxable years ended April 30, 1975 and 1976; (5) whether petitioner is entitled to deductions under section 162 for certain wardrobe and related expenses in the taxable years ended April 30, 1973 through 1976; (6) whether petitioner is entitled to deductions under section 162 in excess of the amounts allowed for expenses incurred for gifts and entertainment in the taxable year ended April 30, 1973; (7) whether petitioner is entitled to a medical expense deduction under section 162(a) in the taxable year ended April 30, 1974 for the payment of medical expenses for Werner and Ellen Erhard; (8) whether petitioner is entitled to rental expense deductions under section 162 for the taxable years ended April 30, 1974 and 1975 for payments made with respect to the Franklin House; (9) whether petitioner is entitled to an automobile expense deduction in the taxable year ended April 30, 1976 under section *84 162 in the amount of $8,558; and (10) whether any part of the underpayment of tax in each of the taxable years ended April 30, 1972 through 1975 is due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). [2]
FINDINGS OF FACT Some of the facts were stipulated and they are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Saratoga Restaurant Equipment Co. (Saratoga) was incorporated under the laws of the State of California on May 5, 1969. Saratoga was a shell corporation which never engaged in any business activities. On October 4, 1971 the Board of Directors of Saratoga *85 resolved to do business under the name of Erhard Seminars Training.A Certificate of Amendment changing Saratoga's name to Erhard Seminars Training, Incorporated (EST) was executed on October 21, 1971 and was filed with the California Secretary of State on December 20, 1971. On November 14, 1975 the Board of Directors of EST resolved to change the name of EST to Twine, Inc. (Twine) and the name was officially changed on January 2, 1976. On December 20, 1976 Twine resolved to liquidate and a Certificate of Winding Up and Dissolution was filed with the California Secretary of State on December 15, 1977. The term petitioner will hereinafter refer to Saratoga, EST or Twine, as appropriate. Petitioner filed its Federal income tax returns for the taxable years ended April 30, 1972 through April 30, 1977 and for the taxable period May 1, 1977 through December 31, 1977 with the Fresno Service Center. Petitioner reported gross income from training sessions and other educational activities, total deductions and taxable income (loss) as follows: Taxable
Taxable Income (Loss)
Year
Gross Income
Deductions
Before NOL Deductions
4/30/72
$250,162
$288,492
($38,964)
4/30/73
1,133,062
1,111,523
19,096 4/30/74
2,012,127
2,026,248
(6,793)
4/30/75
4,761,308
3,064,683
57,444 4/30/76
** 3,478,278
2,005,085
(27,382)
*86 Petitioner reported gross income, deductions and taxable income (loss) for its taxable year ended April 30, 1977 and the taxable period May 1, 1977 through December 31, 1977 as follows: Taxable Year Or
Taxable Income (Loss)
Period Ended
Gross Income
Deductions
Before NOL Deduction
4/30/77
$607,104 $642,202
($35,098)
12/31/77
(62,280)
86,980
(149,260)
Petitioner reported no distributions from retained earnings during the taxable years ended April 30, 1972 through April 30, 1976. Petitioner reported a distribution of property in the amount of $4,344,021 during the taxable year ended April 30, 1977 describing it as a partial liquidation distribution pursuant to section 337. Petitioner reported a final liquidating distribution in the amount of $400,761 on its return for the taxable period ended December 31, 1977. Petitioner's balance sheet as of the end of the taxable years ended April 30, 1972 through April 30, 1977 showed the following: Paid-in
Taxable Year
or
Ended
Common Stock
Earned Surplus
Capital Surplus
4/30/72
$200,000
$ (40,806)
4/30/73
200,000
(23,725)
4/30/74
200,000
(42,269)
4/30/75
200,000
(7,613)
$550,000
4/30/76
200,000
(31,985)
550,000
4/30/77
200,000
(4,411,104)
4,325,000
*87 On July 9, 1971 the original officers of Saratoga were replaced by the following officers: Linda S. Durrant, president, Shirley Hughes, vice-president and Joel Kahan, secretary-treasurer. On October 4, 1971 the above were replaced by the following officers: Werner Erhard (hereinafter Erhard), president, Elaine Cronin, vice-president and K. Laurel Scheaf (hereinafter Scheaf), secretary-treasurer. Scheaf became secretary-treasurer at the request of Erhard. Harry Margolis (hereinafter Margolis) was the attorney for petitioner from its inception through 1975 and subsequently was the attorney for est, An Educational Corporation. Prior to 1971 Erhard worked for various corporations including Parent's Enterprises, the Great Books Corporation and the Grolier Society. In 1971 he became an instructor for Mind Dynamics and while so employed he developed his own concepts which he was anxious to pursue. Erhard, together with his attorney Robert Dunnett (hereinafter Dunnett), discussed this matter at a meeting with representatives of Mind Dynamics. Dunnett was an attorney in the office of Margolis whom Erhard had previously consulted. After the meeting Erhard rejected an offer to become *88 a senior executive of Mind Dynamics and decided to disassociate himself from Mind Dynamics entirely and to devote his efforts to his new concepts. Erhard, in discussing with Margolis and Dunnett the appropriate vehicle for the new enterprise, emphasized that among other considerations he wanted a profit-making structure. On October 4, 1971 the following individuals were elected as officers of petitioner: Erhard, president, Elaine Cronin, vice-president, Scheaf, secretary-treasurer. The October 12, 1971 minutes of the board of directors of Saratoga include the following: 5. Adoption of resolutions. * * * Director HELFRICK moved that the corporation adopt the resolution stating that the Saratoga Restaurant Equipment Company, Inc. which formerly had located its headquarters in Los Angeles, was properly now being located in Saratoga, and was no longer functioning as a restaurant equipment company, but as an organization for the development of human consciousness. The resolution stated: "That the use of the Saratoga Restaurant Equipment Company, Inc. corporation entity for the purposes of Erhard Seminar Training, Inc., was a pure accident, and that there was no relationship between *89 the functions and purposes of the restaurant equipment company with those of the Erhard Seminars Training. The purpose of one, having been inactive, only left a vacuum whereby the new function could start from the ground floor and upon which to build. In fact Erhard Seminars Training is starting totally new, and creating itself out of a vacuum in the first instance." This motion was seconded by Director REINHARDTSEN. After discussion was held among the Directors concerning the motion, on the affirmative vote of a majority of the Directors present, it was resolved that the Saratoga Restaurant Equipment Company, Inc. has no relationship in purpose or function to that of Erhard Seminars Training, Inc. and Erhard Seminars Training, Inc. is creating itself totally free from any of the Saratoga Restaurant Equipment Company, Inc. purposes. On December 22, 1971, Erhard, Margolis and Scheaf were elected as the directors of petitioner. On June 23, 1972 the following individuals were elected as officers of the petitioner: Werner Erhard, chairman of the board K. Laurel Scheaf, president Elaine Cronin, vice-president Gonneke Spits, secretary Jack Rafferty, treasurer Scheaf *90 became president of petitioner at Erhard's request. During the years 1972, 1973 and 1974 there occurred periodic changes in the petitioner's executive roster. On February 27, 1975 the following individuals were elected as officers of the petitioner: Donald F. Cox, president and chief executive officer Marcia L. Martin, vice-president Vincent Freedley III, vice-president K. Laurel Scheaf, secretary Gary P. Grace, treasurer On October 17, 1975 all of petitioner's officers and directors (with the exception of Margolis) resigned and were replaced by Margolis, president and chairman of the board, Doxie Gore, vice-president and director and Thomas Meeham, secretary-treasurer and director. Thomas Meeham had been employed as petitioner's accountant from January through September 1974 at which time he went to work in the Margolis office. Erhard originated the material and created the product marketed by petitioner. He was a central figure in petitioner's operations and was closely involved in the financial aspects of petitioner. Margolis, whom Erhard had consulted in 1971 with respect to the initiation of Erhard's new enterprise, generally implemented tax planning for *91 his clients through use of "planning memoranda" which directed the requisite tax planning steps to be followed. A "planning memorandum" contained drafts of documents necessary for the execution of the transactions involved.On occasion, documentation in support of such transactions was prepared after the transactions had taken place. The group of offshore and domestic corporations, trusts, banks, partnerships and other entities which Margolis and those employed in his office used to implement tax planning for clients was referred to collectively as "the system" and individually as "system entities". System entities were managed and controlled, either directly or indirectly, by Margolis and all financial activities in which they were involved were determined and directed by him. System entities dealt almost exclusively with clients of Margolis in the implementation of tax planning activities. To keep track of the client's tax planning activities and the attendant transactions, Margolis and his employees utilized their so-called system accounting. System accountings were primarily maintained on the cash basis and constituted a chronological history of the transactions of a client *92 within the system. System accounting was devised to enable the Margolis office and the client to determine the client's cash position within the system at any particular time. While the format of system accounting could vary in individual situations, it normally consisted of a work sheet containing columns designating the date, transaction, investment, amount paid in (or credit), amount paid out (or debit) and the balance. There was no requirement that strict accounting rules be followed in preparing and maintaining a system accounting. All funds flowing into the system from a client or an outside entity were entered in the system accounting as a credit while all funds flowing out of the system to a client or outside entity were entered in the system accounting as a debit. Credits were netted against debits to arrive at a balance in the system accounting. If a debit balance existed within the system as shown in the system accounting, funds flowing into the system from the client or outside entity would be used to reduce the debit balance. If a credit balance existed within the system as shown in the system accounting, funds flowing into the system from the client or outside *93 entity increased the credit balance. Since the system accounting only reflected the client's cash position within the system, a loss from an investment in a system entity would not be reflected in the system accounting. Transactions involving transfers of money from one system entity to another system entity could take place even though there was a debit balance in the system accounting. In Margolis' use of a system accounting, transactions involving money transfers could take place without regard to what was included in the system accounting. Funds following into the system from a client in payment of interest on a loan obtained from a system entity were entered as a credit on the system accounting. A credit balance on a system accounting redounded to the benefit of the client in that it was available to him for future use. In order to implement his tax planning techniques Margolis or his employees engaged in so-called "money movements." A typical "money movement" consisted of borrowing money from one system entity and paying it to another. A "money movement" is described by the following pattern: periodically, after an accumulation of "transactions requests" submitted by Margolis *94 or his employees was collated, a series of proposed transactions was plotted on a spread sheet. An authorization form was executed for each transaction by the individual in charge of the particular "money movement." Such authorization forms usually indicated the amount involved in the transaction, the parties involved, whether the money was to leave the system in question and the purposes of the transaction. "Money movements" took place approximately twelve times during a year. In carrying out a particularly complex "money movement" it was customary to hold prior discussions with the financial institutions involved to insure the ready flow of funds. All the necessary documents in a "money movement" were prepared in advance and if a domestic bank was involved said documents were delivered to the bank prior to the "money movement." Certain "money movements" would take place at a determined time as implemented by a series of domestic and international telephone calls placed in sequential order. The following entities, among others, were system entities: International Aesthetics, Ltd. (International Aesthetics); Associated Arts, N.V. (Associated Arts); Presentaciones Musicales, S. *95 A. (Presentaciones Musicales); California Aesthetics, Ltd. (California Aesthetics); Maryelle Corporation (Maryelle); Antigua Banking, Ltd. (Antigua Banking); Anglo Dutch Capital Co. (Anglo Dutch); Koningsplien, N.V. (Koningsplien); World Entertainers, Ltd. (World Entertainers); Associated Convalescent Enterprises; and World Minerals, N.V. (World Minerals). Margolis is the president of Antigua Banking, his wife is vice-president and his daughter is secretary. They have been the principal officers and directors of Antigua Banking since it commenced business operations in California. Margolis was instrumental in the formation of Antigua Banking and closely controlled its operations.Antigua Banking, which does not qualify as a bank under California statute, is regarded by Margolis as a "private financial institution." For the most part, the operation of Antigua Banking involved clients of Margolis. The Margolis professional corporation earned a fee of approximately one percent of the amount of all loans which Antigua Banking carried on its books. Maryelle was incorporated on March 28, 1967 with Elaine Fischel as one of the incorporators. Margolis was a member of a law partnership *96 with Elaine Fischel from 1966 through 1968. As of May 3, 1971 Michael Chatzky and Dunnett, both of whom were lawyers in the Margolis office, served as president and secretary of Maryelle, respectively. Associated Convalescent Enterprises was incorporated on April 7, 1967 with Elaine Fischel as one of the incorporators. Maryelle was the sole shareholder of Associated Convalescent Enterprises. As of June 7, 1971 Michael Chatzky was president and Dunnett was secretary of the entity. Associated Convalescent Enterprises was dissolved on February 28, 1977.During the years here in issue the Margolis office managed the activities of both Marylelle and Associated Convalescent Enterprises. Initially, Margolis owned 50 percent of the stock of Anglo Dutch and subsequently became the sole stockholder. Margolis or his office personnel determined and directed all of the financial activities of Anglo Dutch. International Aesthetics was incorporated under the laws of Nevada on June 4, 1970. The corporation was formed at the instigation of Margolis and dealt primarily with clients of Margolis. The books and records of International Aesthetics were maintained in the Margolis office and employees *97 from said office directed some of the financial activities of International Aesthetics. The officers of International Aesthetics as of October 8, 1970 were located in Nassau, Bahamas. Subsequent to June 1971 the officers of International Aesthetics were located at 14612 Big Basin Way, Saratoga, California which was the address of the Margolis office. World Entertainers, a Bahamian corporation formed under instructions from Margolis, acquired 50 shares of capital stock originally issued by International Aesthetics. On December 14, 1971 the stock was acquired by Associated Arts from World Entertainers. The books of International Aesthetics reflect that Associated Arts made a capital contribution of $2,050,000. The stock of International Aesthetics held by Associated Arts was acquired by Presentaciones Musicales, a Panamanian corporation, on June 21, 1973. International Aesthetics was dissolved on February 28, 1974. The stock (5,000,000 shares) issued by California Aesthetics was initially held by International Aesthetics which entity thereafter transferred said stock to Presentaciones Musicales. The principal officers of California Aesthetics from the date of its incorporation *98 through 1977 included the following: President
Vice-President
Treasurer
Michael Chatzky
Lois Richmond
Mildred Morgan
Ralph Gerowitz
Buford Wood
Dee Hoover
Erwin Lang
Ralph Gerowitz
California Aesthetics was dissolved on November 10, 1977. On November 20, 1972 petitioner's board of directors resolved to issue 20,000 shares of capital stock at $10 per share to International Aesthetics and a stock certificate (No. 1) was issued to that effect. No stock certificates had been issued by petitioner prior to that date. On February 28, 1974 petitioner's board of directors authorized the transfer of the stock held by International Aesthetics to California Aesthetics. Stock certificate (No. 1) was assinged by International Aesthetics to California Aesthetics on February 28, 1974 and on the same date petitioner issued stock certificate No. 101 to California Aesthetics for 20,000 shares. On November 23, 1976 stock certificate No. 101 was assigned by California Aesthetics to Presentaciones Musicales. From the inception of EST in 1971 and through at least 1972 Erhard personally conducted all training sessions disseminating his concept described as the *99 Body of Knowledge (hereinafter sometimes described by the terms est standard training or standard training). Erhard considers the training as "know-how which we pass on to people about what to do to have the ability to make their lives work for them more effectively." The first training session was held at some time in October 1971. The standard training was imparted by a trainer in 52 to 60 hour sessions held on two consecutive weekends with groups of 200 to 250 trainees. By the end of 1972 two additional individuals became qualified as trainers and additional trainers were developed through 1975. Erhard selected all of the individuals who became trainers. From 1971 to 1975 Erhard developed other programs in addition to the est standard training, including communication workshops, the relationships program and graduate review seminars. Tuition or entrance fees were charged by EST for attendance at the training sessions, lectures, workshops, graduate review seminars and other activities. Beginning in January 1972 audiotapes were made of the standard training and the graduate review seminar as well as other presentations and seminars.In November 1973 a black and white videotape *100 recording was made of an entire 60-hour standard training session conducted by Erhard for use in training additional trainers. In August 1975 a videotape recording was made in color of another training session conducted by Erhard, again for use in training additional trainers. A number of manuals and transcripts were also prepared during this period relating to various forms of the est standard training. Initially, petitioner had six employees and by 1975 it had some 50 or 60 employees. On October 4, 1971 the following document was executed by Erhard and Presentaciones Musicales: AGREEMENT OF SALE
This Agreement is entered into this Fourth day of October, 1971, by and between WERNER ERHARD, an individual, hereinafter referred to as SELLER and PRESENTACIONES MUSICALES, SA, a Panamanian corporation, hereinafter referred to as BUYER. RECITALS
(1) SELLER has originated certain processes, methods and procedures which stimulate the growth and expansion of human mental powers. Unless properly developed, such mental growth and expansion would, in the normal course of human life, remain dormant; (2) SELLER desires to dispose of his interest in these processes, methods and *101 procedures; and, (3) BUYER desires to obtain the exclusive rights to all of SELLER'S processes, methods and procedures. NOW, THEREFORE, for valuable consideration and in consideration of the mutual promises of the parties hereto, the parties agree as follows: (1) SELLER and BUYER acknowledge that this Agreement is being executed simultaneously with an employment contract by and between BUYER and SELLER. A copy of said employment contract is marked Exhibit "A", attached hereto and incorporated by this reference as if fully set forth herein. (2) SELLER hereby assigns, transfers, and sets over to BUYER all of his right, title and interest in and to any and all of the processes, methods and procedures he has originated in the area of mind expansion and mental awareness. Additionally, SELLER assigns all of his right, title and interest in and to any future developments in the above-designated areas so long as he shall be employed by BUYER pursuant to the terms and conditions of the contract attached hereto as Exhibit "A". The lawful termination of either agreement (Exhibit "A" or the agreement herein) shall automatically and simultaneously terminate the other agreement. (3) *102 SELLER and BUYER recognize that many of the processes, methods and procedures are intangible items existing only within the mind of SELLER. SELLER represents that he will reduce said intangible items to writing within a reasonable period of time after the execution of this Agreement. BUYER shall possess all rights incident to ownership in said processes, methods and procedures including all of those intangible items described above. (4) BUYER agrees to pay SELLER One Million Dollars ($1,000,000.00) for the above-described processes, methods and procedures. Said amount includes a four percent (4%) interest factor and the total amount of principal and interest shall be due and payable on October 4, 1981. (5) SELLER guarantees BUYER that within the TEN (10) year period preceding the above-described payment to SELLER, BUYER shall realize Six Million Dollars ($6,000,000.00) in gross income by and through the proper, prudent, efficient and business-like use and development of the within-described processes, methods and procedures. BUYER represents that it shall use and develop said processes, methods and procedures in a competent business fashion and use all reasonable effort to *103 maximize gross income from their use and development. SELLER and BUYER agree to review, at least annually the direction and policy which BUYER is undertaking in said use and development. BUYER agrees that any significant and/or other than ordinary directional and/or policy change shall be discussed with SELLER at the time of its occurrence in addition to any planned annual meetings. Should BUYER not realize said Six Million Dollars ($6,000,000.00) in gross income in the described Ten (10) year period there shall be pro rata reduction of price due and payable on October 4, 1981. * * * * * * (10) This Agreement shall be binding upon the successors, heirs, executors, administrators, and assigns of the parties hereto. IN WITNESS WHEREOF, the parties hereto set their hands and seals the day and year first above written. PRESENTACIONES MUSICALES, SA, BUYER By: a/s/b M. D. Jobin, Vice-President a/s/b W. Erhard Werner Erhard Erhard never received any portion of the $1,000,000 specified in paragraph 4 of the Agreement of Sale dated October 4, 1971. Erhard and Presentaciones Musicales also executed the following agreement dated October 4, 1971: EMPLOYMENT CONTRACT
*104 This Agreement is entered into in San Francisco, California, on October 4, 1971, by and between WERNER ERHARD, hereinafter referred to as EMPLOYEE and PRESENTACIONES MUSICALES, SA, hereinafter referred to as EMPLOYER. RECTALS
(1) EMPLOYER has simultaneously herewith obtained the exclusive rights to EMPLOYEE's processes, methods and procedures; and in addition to that acquisition would like to obtain the personal services of EMPLOYEE; and, (2) EMPLOYEE is seeking a financially satisfactory permanent arrangement which will be coupled with the sale of his processes, methods and procedures. NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties hereto agree as follows: (1) The parties recognize and acknowledge that this Agreement is being executed simultaneously with an AGREEMENT OF SALE by and between EMPLOYEE and EMPLOYER. Said AGREEMENT is marked Exhibit "A", attached hereto and incorporated by this reference as if fully set forth herein. (2) This Agreement shall be effective as of October 4, 1971, and shall continue until mutually rescinded by the parties hereto or until such other termination occurs under the terms and conditons as *105 set forth herein. (3) EMPLOYER shall pay to EMPLOYEE, as salary, Two Thousand Five Hundred Dollars ($2,500.00) per month for the duration of this Agreement. Said compensation shall be reviewed and discussed annually on each October 4 or on such other date as may be mutually agreed upon by the parties hereto and said amount may be increased or decreased at any such meeting for the ensuing yearly term but shall at no single meeting be increased or decreased more than Five Hundred Dollars ($500.00) per month. Each party agrees to and guarantees a good faith participation in said annual compensation discussions. EMPLOYER may, at its sole discretion, award EMPLOYEE a bonus within the last thirty (30) days of any calendar year. (4) EMPLOYEE shall have a reasonable opportunity to approve all services required of him by EMPLOYER and EMPLOYEE may refuse to perform any services which are not in keeping with his competence, position and personal dignity in the area of mind expansion and growth of mental awareness.EMPLOYEE recognizes that it is in the mutual interest of himself and EMPLOYER that he remain an active public figure in these areas and, therefore, he agrees that he will not *106 unreasonably refuse to perform any services called for by the terms of such agreement. Should a dispute arise between the parties concerning the reasonableness of any EMPLOYEE refusal to perform any said services, such dispute shall be subject to binding arbitration. * * * (5) EMPLOYER recognizes the unusual qualities which EMPLOYEE possesses and hereby agrees that he shall be given full credit and recognition for all present processes, procedures, methods and to any further developments for which he may be responsible during a term of this Agreement and EMPLOYER further agrees that any organizations, entities or other groups which are established to promote, produce or otherwise disseminate such creations shall always give due recognition to EMPLOYEE. (6) The compensation to be paid to EMPLOYEE under this Agreement shall not include payment for his services in other than a person-to-person, face-to-face dissemination of the processes, procedures and methods and promotion thereof; and, EMPLOYEE shall receive Ten Percent (10%) of all income from publication, recording, television, motion pictures and any other related dissemination that does not involve a person-to-person, face-to-face *107 presentation. This percentage may vary according to the terms of the contracts entered into between EMPLOYER and others (with the reasonable approval of EMPLOYEE as defined in #4 above) but shall in any Two (2) year period equal a Ten Percent (10%) return from all such income in any of the above-described areas. (7) EMPLOYEE agrees that he will perform his services exclusively for EMPLOYER. (8) EMPLOYER agrees to pay EMPLOYEE either directly or by way of reimbursement, all medical, dental and hospital bills incurred by EMPLOYEE himself, or by his wife or by whose of his children who qualify as dependents under Sections [sic] 152 of the Internal Revenue Code of 1954. (9) EMPLOYER shall provide EMPLOYEE during the employment term with the use of an automobile whose total price shall not exceed Twelve Thousand Dollars ($12,00.00) with optional equipment at EMPLOYEE's selection. EMPLOYER agrees to pay all operating expenses of any nature whatsoever with regard to such automobile and to procure and maintain in force an automobile liability insurance policy on such automobile, with coverage including EMPLOYEE.EMPLOYER in its sole discretion may designate that EMPLOYEE be the registered *108 owner of the automobile and/or the policy of insurance be in the name of EMPLOYEE. (10) EMPLOYER requires EMPLOYEE to maintain a private office with stenographic help, office equipment, supplies and such other facilities and services that are equitable to his position and adequate for the performance of his duties. EMPLOYER shall pay all expenses, including rent and property taxes if required, incurred in such private office. (11) EMPLOYEE is authorized to incur reasonable business expenses for promoting, including expenditures for entertainment, gifts and travel. EMPLOYER will reimburse or pay directly EMPLOYEE's expenses in those areas provided only that EMPLOYEE presents to EMPLOYER reasonable documentary or other evidence of such expenditures. (12) All business expenses as described herein reasonably incurred by EMPLOYEE in promoting the business of EMPLOYER, including expenditures for entertainment, gifts and travel, are to be paid for, insofar as this is possible, by the use of credit cards in the name of EMPLOYER. EMPLOYER will furnish such cards to EMPLOYEE as EMPLOYER in its discretion deems necessary for EMPLOYEE's use. (13) EMPLOYER agrees to provide to EMPLOYEE *109 a Four Hundred Twenty-Five Thousand Dollar ($425,000.00) of Five (5) years. EMPLOYEE must request said loan be made within Five (5) years of the execution of this Agreement or EMPLOYER is no longer bound to make such loan. (14) EMPLOYER recognized [sic] that EMPLOYEE's public appearance will have a direct bearing upon his performance in his presentations of processes and methods and thereby agrees that it shall provide a monthly clothing budget of Five Hundred Dollars ($500.00). Such clothes as purchased by EMPLOYER shall remain the property of EMPLOYER and EMPLOYEE shall be responsible for all but reasonable wear and tear on such clothes. EMPLOYER guarantees an initial wardrobe allowance, in addition to the above monthly allowance, of Five Thousand Dollars ($5,000.00). Said sum shall be payable within Two (2) years from date of this Agreement. (15) The office which EMPLOYER agrees to maintain for EMPLOYEE shall contain sleeping quarters and it is presently contemplated that it may be a home in San Francisco. It is expected and agreed that expenses for such office might run as high as One Thousand Dollars ($1,000.00) per month. EMPLOYER agrees to assume those expenses provided *110 they do not exceed an average of One Thousand Dollars ($1,000.00) per month for any One (1) year period. Should expenses exceed One Thousand Dollars ($1,000.00) per month for any One (1) year period, EMPLOYEE shall be liable and shall pay the difference. (16) EMPLOYER agrees that it will provide to EMPLOYEE any and all expenses and membership dues or any other related expenses in professional organizations which will further his experience, knowledge and public exposure in the area of mind expansion and development. These expenses shall extend to social as well as business clubs, organizations and associations. * * * (22) EMPLOYEE will at all times cooperate fully with EMPLOYER in seeking and obtaining employment opportunities. Should EMPLOYEE become aware of possible employment opportunities, he shall bring them to the prompt attention of EMPLOYER. EMPLOYEE agrees he shall cooperate fully with EMPLOYER and make all attempts to arrange for his employment when such opportunities arise. (23) From and after this date, EMPLOYEE shall not enter into any other agreement of any kind with reference to employment or services described herein without prior notice to EMPLOYER, its *111 successors or assigns, for the duration of this Agreement. If such employment or services are to be undertaken by EMPLOYEE during a time in which he is not under the exclusive control of EMPLOYER, EMPLOYER must give its written consent prior to EMPLOYEE's agreement to engage in such services. However, EMPLOYER agrees it shall not unreasonably withhold its consent, if the terms of the performance of such services are within the provisions of this Agreement. (24) EMPLOYEE shall make himself available from time to time for necessary promotional activities at the request of EMPLOYER and at the sole expense of EMPLOYER, provided only that time spent in such promotional or publicity activities shall be charged against the total time required by EMPLOYEE on this Agreement. (25) EMPLOYEE agrees to execute at any time any and all documents of any kind and nature whatsoever which EMPLOYER may request in order to confirm and enforce the rights of EMPLOYER to the processes, methods and presentations as more specifically defined herein as they had been transferred to EMPLOYER. (26) No amendment or variation of the terms of this Agreement shall be valid unless made in writing and signed *112 by the EMPLOYEE and the fully authorized representative of the corporation. (27) A waiver of any of the terms and conditions contained in this Agreement shall not be construed as a general waiver by the waiving party, and the waiving party shall be free to reinstate said part or clause, so long as the other party receives due notice of the reinstatement. Said notice may be either oral or in writing. (28) This Agreement shall be binding upon the successors, heirs, executors, administrators, and assigns of the parties hereto. IN WITNESS WHEREOF, the parties hereto set their hands and seals the day and year first above written. PRESENTACIONES MUSICALES, SA By: a/s/b M. D. Jobin, Vice-President a/s/b W. Erhard WERNER ERHARD On December 4, 1971 petitioner and Presentaciones Musicales executed the following agreement: LICENSE AGREEMENT
This Agreement is entered into this 4th day of December, 1971, by and between PRESENTACIONES MUSICALES, SA, a Panamanian Corporation, hereinafter referred to as LICENSOR, and ERHARD SEMINARS TRAINING, INCORPORATED, a California corporation, hereinafter referred to as LICENSEE. RECITALS
(1) LICENSOR has obtained the exclusive *113 rights to certain processes, methods and procedures developed by WERNER ERHARD, hereinafter referred to as ERHARD, as well as the exclusive right to ERHARD's personal services; (2) LICENSOR desires to dispose of a portion of these exclusive rights and services; and, (3) LICENSEE wishes to obtain a Ten (10) year right to be the exclusive United States distributor of the processes, methods and procedures as well as ERHARD's personal presentations thereof. NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, it is agreed as follows: I LICENSOR hereby grants to LICENSEE an exclusive Ten (10) year license to all and everything LICENSOR possesses pursuant to that certain Agreement of Sale entered into on the Fourth day of October, 1971, by and between ERHARD and LICENSOR. A copy of such agreement is marked Exhibit "A", attached hereto and incorporated by this reference as is fully set forth herein. Said license rights shall be limited to presentations to be made in the United States unless specific written permission is obtained from LICENSOR for foreign presentations. The term United States shall include the Continental United States, Alaska, Hawaii *114 and any other possessions or territories of the United States of America. II LICENSEE shall pay LICENSOR One Million Two Hundred Thousand Dollars ($1,200,000.00) for such exclusive rights. Said One Million Two Hundred Thousand Dollars ($1,200,000.00) shall be payable within Thirty (30) days of the signing of this Agreement. III LICENSOR guarantees that LICENSEE shall realize at least Five Million Dollars ($5,000,000.00) in income as more specifically described in Paragraph 5 and 6 of Exhibit "A". IV LICENSOR warrants and guarantees to LICENSEE that it possesses good, marketable title to the subject matter being transferred herein. LICENSOR will, at his sole expense, defend any and all attacks on ownership levied by anyone against LICENSEE. V LICENSOR agrees not to compete in any manner or form with LICENSEE in the Continental United States as described herein or in any other area during such time as specific written permission has been granted to LICENSEE to present the processes, methods and procedures which are the subject matter of this Agreement. VI LICENSEE hereby specifically assumes all obligations of LICENSOR to ERHARD as such obligations are contained *115 in an employment contract between LICENSOR and ERHARD. A copy of such contract is marked Exhibit "B" and incorporated by this reference as if fully set forth herein. VII It is understood and agreed between the parties hereto that ERHARD by his signature on this Agreement, has given his written consent to the terms of this Agreement and to the transfer of said employment contract (Exhibit "B"). * * * IX LICENSEE shall have the option to extend this Agreement for Five (5) additional years provided that One (1) year's written notice be given to LICENSOR. Within Thirty (30) days of the exercise of the option, LICENSEE shall pay to LICENSOR an additional Six Hundred Thousand Dollars ($600,000.00). * * * XI This Agreement shall be binding upon the successors, heirs, executors, administrators, and assigns of the parties hereto. IN WITNESS WHEREOF, the parties hereto set their hands and seals the day and year first above written. PRESENTACIONES MUSICALES, SA By: a/s/b/ M. D. Jobin, Vice-President ERHARD SEMINARS TRAINING, INCORPORATED By: a/s/b/ K. Laurel Scheaf K. Laurel Scheaf, Secretary Treasurer Approved: a/s/b/ W. Erhard Werner Erhard Margolis represented *116 Erhard and petitioner in connection with the preparation and execution of the sales agreement dated October 4, 1971, the employment agreement dated October 4, 1971 and the license agreement dated December 4, 1971 described above. On December 19, 1971 petitioner's board of directors resolved that petitioner obtain a 10-year license, with a five-year renewal period, for the exclusive rights to certain properties, methods, and procedures developed by Erhard for $1,200,000 and further resolved as follows: * * * RESOLVED, that in order to retain the services of Werner Erhard as a trainer and to insure continuity of management to the corporation and the unique personal services which such individual can provide in furtherances of the purposes of this corporation to carry on seminars in mind expansion, this corporation enter and the secretary-treasurer is directed to execute on behalf of the act of this corporation, a written document of licensing the personal services of said Werner Erhard, which license is an exclusive one from PRESENTACIONES MUSICALES, S.A., a Panamanian corporation, to whom he is under contract, and under said license from this PMSA as licensor, have the exclusive *117 rights to the personal services of said Werner Erhard for a term of 10 years as trainer for programs in aliveness as well as president of this corporation on the terms and conditions and for the compensation set forth in the form of the license, which compensation is paid solely by PMSA, and which license is directly authorized as a charge against this corporation, the substance of which is embodied in the employment contract or agreement for personal services presented to this meeting * * * * RESOLVED FURTHER, that under the terms of such PMSA-Erhard agreement for personal services, there is subject to the approval of Erhard, the acceptance of any employment which PMSA by license or otherwise may provide for said Erhard. It is therefore understood that said officer is hereby as president directed to execute on behalf of and as the person rendering services under said contract, such authorization or approval as he in his absolute discretion deems fit, with the complete approval of this corporation, as evidenced by the signature of its secretary-treasurer, who is hereby authorized to make such authorization. On December 20, 1971 petitioner's board of directors adopted the following *118 resolution: WHEREAS an offer has been made to this corporation to enter a contract with PMSA for the purpose of licensing the exclusive right to the body of knowledge developed by Werner Erhard, as well as the exclusive license to the use of the personal services of Werner Erhard in the continental United States, and, WHEREAS, Werner Erhard, a director of this corporation, has disclosed to the directors present at this meeting that he is interested in such transaction in that he has sold all rights to the development and research in his body of knowledge to PMSA and shall benefit under the terms of that contract in the event the use of said body of knowledge provide [sic] a significant amount of income to PMSA in the next ten year [sic], and that under the agreement with PMSA as employee he is guaranteed a certain monthly income of Twenty Five Hundred Dollars ($2,500) per month, together with an average of 10% of the profits from tape recordings, motion pictures and video tapes which are made of his performances, such services to be rendered under his employment contract with PMSA to be subject to his own personal standards of approval as to whether same are consistent with *119 the dignity required for an individual who is a recognized leader of consciousness or mind-expanding programs, THEREFORE, be it resolved that this corporation accepts the offer of PMSA to enter into such transaction and the secretary-treasurer of this corporation is authorized and directed to execute it on behalf of and as the act of this corporation a written contract with said Presentaciones Musicales, S.A. in the form presented to this meeting and hereby order it attached to the minutes of this meeting, * * * On December 14, 1971 petitioner's board of directors authorized Erhard (as chairman of the board) and Scheaf, as president, to borrow $1,000,000 from International Aesthetics, a Nevada corporation, and as security for said loan to "execute documents conveying the copyrighted copies of the body of knowledge in a form to be agreed upon by said officers in the corporation." A resolution adopted by petitioner's board of directors indicates that Erhard and Scheaf were not elected as petitioner's chairman of the board and president, respectively, until June 23, 1972. On December 14, 1971 Joel Kahan, as president of International Aesthetics, executed a promissory note in favor *120 of Associated Arts (Curacao, Netherlands Antilles) in the amount of $6,911,835. On December 15, 1971 International Aesthetics (14612 Big Basin Way, Saratoga, California) opened a checking account in the Union Bank (Wilshire Center, regional head office, Los Angeles) with a deposit of $7,000,000. On the same date the account was charged with the following amounts: $800,000 paid to World Entertainers, $5,000,000 paid to Koningsplien; and $1,200,000 paid to an unidentified payee. On December 14, 1971 Erhard, representing petitioner, executed a promissory note in favor of International Aesthetics stating that [t]en years after date, for value received, the undersigned ERHARD SEMINARS TRAINING INCORPORATED, promises to pay to INTERNATIONAL AESTHETICS, LTD., or order, at its Saratoga, California office, ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) with interest payable monthly at the rate of Ten Percent (10%) per annum from December 14, 1971 until paid * * * * The reverse said of said note contained the following assignments: For value received International Aesthetics, Limited hereby sets over, conveys, assigns and transfers the within promissory note to Presentaciones *121 Musicales, S.A., a Panamanian corporation, without warranty. Interest has been paid on said promissory note through February 28, 1974, and principal has been paid in the amount of $90,000. Dated: February 28, 1974 INTERNATIONAL AESTHETICS, LIMITED
By: (Signed) Daniel J. Parks Daniel J. Parks, President Presentaciones Musicales, S.A. hereby transfers all of its interest in the within note to World Entertainers Limited, effective February 28, 1974, with interest paid through the effective date. This transfer is made with recourse. Dated: 4th March, 1974 PRESENTACIONES MUSICALES, S.A. By: (signed) M. D. Jobin M. D. Jobin, Vice-President World Entertainers Limited hereby assigns and sets over to Antigua Banking Limited all of the right, title and interest of World Entertainers Limited in and to the within obligation, effective to 1st day of March, 1974 with interest paid through the month of February, 1974. This assignment, is made with recourse. Dated: 12th March, 1974 WORLD ENTERTAINERS LIMITED
By: (signed) M. D. Jobin M. D. Jobin, Vice-President In addition to the promissory note described above, Erhard, representing petitioner, also executed a promissory *122 note form, denominated Note No. 1 and dated December 14, 1971, which stated that petitioner promised to pay $1,000,000 to International Aesthetics one year after date payable monthly at the rate of 10 percent per annum from December 14, 1971. In a letter dated December 14, 1971, Scheaf, representing petitioner, authorized the Union Bank (Wilshire Blvd. at Western, Los Angeles) to transfer $1,200,000 to Presentaciones Musicales. On December 20, 1971 petitioner opened a checking account in the Union Bank (San Jose Regional Office, San Jose) with a deposit of $1,200,000 and a withdrawal of this same amount was made on the same day. An "account charge" issued by the Union Bank shows that an amount of $1,200,000 was withdrawn from this account and remitted to a bank account of Presentaciones Musicales in Curacao, Netherlands Antilles on December 15, 1971. International Aesthetics issued three checks signed by Joel Kahan to petitioner dated September 9, 1971 in the amounts of $100, $100 and $10,000. Erhard, representing petitioner, executed a promissory note (Note No. 2) dated October 1, 1971 to International Aesthetics in the amount of $10,200. This transaction was recorded in petitioner's *123 General Journal on January 31, 1972. On August 31, 1972 Erhard executed a promissory note in favor of International Aesthetics in the amount of $425,000. Erhard did not solicit this loan from International Aesthetics but, instead, discussed his need for a loan with someone in the Margolis office. Petitioner's books and records reflected payments designated as interest payments on the loans obtained from International Aesthetics. During the years 1971-1975 Erhard made presentations on behalf of petitioner outside the United States. He did not obtain written permission from Presentaciones Musicales to make said presentations. On August 9, 1973 petitioner and Presentaciones Musicales executed the following document: PRESENTACIONES MUSICALES, S.A., P.O. Box 4096, Nassau, Bahamas, Telephone 2-3998 AGREEMENT FOR THE PARTIAL REPURCHASE OF EXCLUSIVE LICENSE RIGHTS
This Agreement is entered into this 9th day of August, 1973, by and between ERHARD SEMINARS TRAINING, a California corporation, and PRESENTACIONES MUSICALES, S.A., a Panamanian corporation, hereafter respectively referred to as EST and PMSA. * * * WHEREAS, EST presently possesses an exclusive ten (10) year license *124 to certain processes, methods and procedures originated and developed by Werner Erhard (referred to hereinafter as License), which License is more specifically set forth in that certain agreement dated December 4, 1971, a copy of which is attached hereto as Exhibit "A" and incorporated herein as if set forth in full; and WHEREAS, EST is engaged in conducting seminars, experiences and training under said License in the United States; and, WHEREAS, PMSA and EST desire to improve and expand the promotion and the availability of the License program; and, WHEREAS, PMSA believes that the best way to make the License program available all over the world is through the promulgation of the License by graduates associated in localized areas; and WHEREAS, PMSA desires to repurchase from EST localized rights to License; and WHEREAS, the parties desire to modify the agreement attached hereto as Exhibit "A"; NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, it is hereby agreed: 1. This Agreement refers and relates to the State of Hawaii, U.S.A., only. The parties hereby rescind and cancel the License granted and agreed upon in the agreement attached hereto *125 as Exhibit "A" as it relates to the State of Hawaii. 2. Said License rescission and cancellation shall become effective immediately. EST will cease to transact any and all business in the State of Hawaii except for necessary closeout thereof. * * * 6. PMSA shall pay to EST Four Thousand, One Hundred Sixty-Six Dollars and Sixty-six Cents ($4,166.66) per month, commencing with the month of August * * * and continuing for the full balance of the ten-year License now being relinquished by EST. * * * * * * 10. PMSA recognizes and acknowledges that EST has made a substantial contribution to the development of License and that the future of License everywhere will necessarily be enhanced by the continued viability and success of EST. PMSA will attempt to continuously involve EST in the growth of License all over the world. PMSA guarantees to EST the opportunity to supply trainers everywhere that trainers may be required, and PMSA agrees not to enter into any independent program for the development of trainers without prior communication with EST. * * * * * * 12. PMSA and EST share the goal that License shall at all times in its procedures, methods, processes and promotion *126 be a thoughtful, constructive and useful public service. PMSA intends at all times to reserve to itself ultimate control of License for the sole purpose of accomplishing this goal. EST agrees that it will adopt a similar program with reference to its personnel with the same goal in mind. EST will, on request from PMSA or any of its Licensees, review advertising and promotional material as well as collateral services and activities, to insure that the goal is kept in mind at all times in all areas. PMSA will compensate EST for any unusual services of this kind. 13. PMSA will not enter into any independent contractual relationship with any employee of EST without the prior written approval of EST for the period of this Agreement, provided only that EST shall be performing satisfactorily under this Agreement. 14. EST does intend to and will make available to PMSA the rights for various areas controlled by EST with reference to License as requested by PMSA. Reasonable compensation shall be paid for any such modification of the license rights held by EST. EST shall have the opportunity to supply trainers and all other services relating to License for any such local areas relinquished *127 by EST to PMSA. 15. The Agreement of December 4, 1971, shall continue unchanged as between the parties except as expressly modified herein. * * * IN WITNESS THEREOF, the parties have set their hands and seals the day and year first above written. PRESENTACIONES MUSICALES, S.A. By: (signed) M. D. Jobin, Vice President ERHARD SEMINARS TRAINING By: (signed) K. Laurel Scheaf, President Commencing with the December 4, 1971 License Agreement petitioner amortized the cost of the license at the rate of $10,000 per month through August 31, 1975. Petitioner did not reduce the asset value of the license on its books to reflect the August 9, 1973 agreement with Presentaciones Musicales for the partial repurchase of exclusive license rights by Presentaciones Musicales. Nor did petitioner reduce the monthly amortization of $10,000 which petitioner had previously been claiming as a deduction with respect to the license. Petitioner claimed amortization deductions with respect to the license through August 31, 1975 in the total amount of $440,000, leaving an unamortized amount as of that date of $760,000. Petitioner then reclassified the unamortized balance as an account *128 receivable from Presentaciones Musicales. As of December 1976 no effort had been made by petitioner to collect this unamortized amount Respondent disallowed the amortization deductions claimed by petitioner in each of the taxable year ended April 30, 1972 through 1976. On or about September 1, 1975 est, An Educational Corporation was formed with Don Cox as president and Scheaf as secretary. It is stipulated that the tax consequences of the transfer of any assets and liabilities from petitioner to est, An Educational Corporation, are not in dispute.For the most part the management and employees of petitioner continued with est, An Educational Corporation which also took over substantially all of petitioner's training facilities throughout the United States. The newly formed corporation continued to give the standard training formerly given by petitioner and also continued the communication workshops, relationships programs, graduate reviews, childrens' programs and prison trainings formerly conducted by petitioner. Petitioner ceased its various business activities (including the standard training) and, upon changing its name to Twine late in 1975, it did not retain any of the *129 EST employees or officers. Margolis became president of Twine. A document described as a "Termination Agreement," dated effective as of September 1, 1975, was executed by Erhard and Presentaciones Musicales and stated in part as follows: * * * WHEREAS, the parties entered into an Agreement of Sale and Employment Contract on 4 October 1971, and WHEREAS, the principal item of importance in the Agreement of Sale was the right to material developed by ERHARD, hereinafter referred to as the "Body of Knowledge," and WHEREAS, control of the Body of Knowledge was transferred by ERHARD to PMSA, and WHEREAS, the parties at the outset of their relationship were not aware of the potential value of the Body of Knowledge in human terms, and * * * WHEREAS, ERHARD concluded in 1974 that the future availability, development and growth of the Body of Knowledge in a responsible fashion to serve all of humanity required a basic change in the relationships established 4 October 1971, and * * * THEREFORE, the parties are in alignment and agree to go forward as follows: 1. The Agreements between the parties of 4 October 1971 are hereby terminated effective 26 August 1975 on the basis *130 of and under the conditions set forth in this Agreement. The parties intend such termination to be responsible and supportive and there is no question as between them of any or anything being wrong in their initial relationship and its operation to date. ERHARD specifically acknowledges the contribution that PMSA has made to the dissemination of the Body of Knowledge. 2. The employment arrangements under which the services of ERHARD were made available to PMSA for a period of years led to the direct employment of ERHARD by Erhard Seminars Training, a California corporation. Such arrangements are terminated effective 1 September 1975. Erhard Seminars Training, hereinafter referred to as Twine, will execute a copy of this Agreement to confirm its acquiescence in the termination of its employment relationship with ERHARD. 3. The circumstances existing on [sic] October of 1971 have changed dramatically. The parties then contemplated a relatively small and slowly growing educational program. Neither party anticipated the manner in which the Body of Knowledge would explode in terms of public acceptance. It is now clear that the responsible dissemination of the Body of Knowledge *131 as rapidly as possible everywhere must take priority over any other purposes to be served. ERHARD has moved forward to make it possible for the Body of Knowledge to be controlled for the United States of America by an educational trust located in the British Commonwealth and for the rest of the world by an educational foundation established in Switzerland. 4. PMSA has reacquired all of the rights to the Body of Knowledge which it had at any time. It has disposed of such rights effective 1 September 1975 to Welbehagan B.V. PMSA warrants it has or will have responsibly compensated all those individuals or entities which have had, directly, or indirectly, an interest in the Body of Knowledge prior to 1 September 1975. ERHARD has no responsibility for such compensation. 5.In the disposition of its rights with reference to the Body of Knowledge, PMSA acknowledges the continuous development of the Body of Knowledge and intends to include all of the Body if Knowledge as it is developed to date in the transfer to Welbehagen. 6. ERHARD accepts full responsibility for the future of the Body of Knowledge. This includes future growth, responsibility for scientific research and legal *132 design and structure. ERHARD shall hold PMSA harmless in all respects with reference thereto. 7. The parties intend that PMSA, directly and in a representative capacity, shall be fully and fairly compensated for the services it has rendered to ERHARD and the Body of knowledge. PMSA has accepted as reasonable a proposal from Welbehagen, B.V. for final disposition by PMSA of its rights to the Body of Knowledge. PMSA has agreed that any difficulty as to compensation will be submitted to arbitration in London and application will be made to an appropriate London Court if there are any procedural problems. 8. ERHARD accepts ultimate responsibility for the continued integrity of the Body of Knowledge. PMSA has provided in its disposition of its rights to the Body of Knowledge for protection of the views of ERHARD with reference to the Body of Knowledge for the indefinite future. 9. For clarity and for no other purpose, the parties now refer to the Agreement of Sale and the Employment Contract, both of 4 October 1971, and specifically note as follows: a. ERHARD, as the source of the Body of Knowledge, was and continues to be indispensable to its presentation and development. *133 For the present, the comfortable responsible availability of ERHARD together with the Body of Knowledge is essential if this Agreement and its purpose is to be meaningful. ERHARD has therefore advised PMSA and the various entities having any relationship with the Body of Knowledge as a result hereof that ERHARD will continue on a reasonable basis to accompany and be part of the Body of Knowledge for the indefinite future. To that end, ERHARD has negotiated with est, U.S.A., an Employment Agreement making the services of ERHARD available to carry out the purposes intended by the parties. b. PMSA has made no payment to ERHARD under the Agreement of Sale. All requirements for any such payment are cancelled effective with the execution of this Agreement. c. The guarantees made by ERHARD to PMSA in the Agreement of Sale have not been realized. The parties acted responsible at all times and neither was at any time in the wrong. There was no default or neglect by ERHARD at any time. There is little doubt but what the guarantees would have been achieved over the total period of the Agreement of Sale. The guarantees of ERHARD are cancelled effective with the execution of this Agreement. *134 d. ERHARD acknowledges having been fully compensated in all respects under the PMSA Employment Contract. ERHARD does not now nor will he at any time in the future seek compensation or damages from PMSA or any other entity or individual related to PMSA for any compensation arising under the Employment Contract. Included shall be all claims which Erhard may have, whether or not he has knowledge of them as of this date, with reference to medical reimbursement, automobile expenses or costs, private office provisions, or other business expenses included or beyond Paragraphs 8, 9, 10, 11 or 12 of the Employment Contract of 4 October 1971. This acknowledgment shall extend to Twine as the prior employer. e. The specific references in this paragraph are part of the total agreement and are not intended to excluded any items omitted and are rather extensions of the Agreements reached between the parties. 10. Financial obligations between the parties have been fulfilled by the parties. The Four Hundred and Twenty-Five Thousand Dollar ($425,000.00) loan to ERHARD was made by PMSA under Paragraph 13 of the Employment Contract.This item continues to exist independent of this Agreement. *135 11. PMSA acknowledges that the Standard Training was properly copyrighted with the full consent of PMSA in the name of WERNER ERHARD on 16 January 1976 in the United States Copyright Office. ERHARD has the full permission of PMSA and the right to extend such claims throughout the world. PMSA does not now and will not at any future date make any claim of ownership or participation in the Body of Knowledge or the est Standard Training based upon any Agreements, oral or written, between ERHARD and PMSA or between PMSA and any other entity. 12. The parties acknowledge that it may be desirable to modify or waive one or more of the provisions of this Agreement and the general understandings of the parties in order to carry out their agreed purposes. No such action shall be effective unless set forth in writing signed by the parties and clearly setting forth the consequences of such action. The parties intend to cooperate fully as to any documentation that may require execution at any time, as to any litigation or any other action that may be required at any time and generally to support the purposes of this Agreement. A document described as a "Purchase Agreement," dated effective *136 as of September 1, 1975, was executed by Presentaciones Musicales and Welbehagen International, N.V. and stated as follows: This agreement is entered into by and between PRESENTACIONES MUSICALES, S.A., a Panamanian corporation, hereinafter referred to as "PMSA," and WELBEHAGEN INTERNATIONAL, a Netherlands corporation, hereinafter referred to as WELBEHAGEN, to be effective September 1, 1975. WITNESSETH:
WHEREAS, PMSA has certain rights in and to the est Body of Knowledge developed by Werner Erhard, and WHEREAS, PMSA has certain continuing rights to developments with reference to the est Body of Knowledge, whether by Werner Erhard or others, including literary and other copyrights, trade names and trademarks, and the like, and, WHEREAS, PMSA by contract is entitled to control and designate the manner in which the services of Werner Erhard were to be performed, and WHEREAS, Werner Erhard and PMSA have reached agreement as to the appropriate future development and delivery of the est Body of Knowledge, and, WHEREAS, Werner Erhard and PMSA have made arrangements under which PMSA must dispose of its rights to the est Body of Knowledge to a party acceptable to Werner Erhard, *137 and WHEREAS, WELBEHAGEN is prepared to acquire from PMSA the rights to the est Body of Knowledge under terms and conditions that are mutually acceptable to the parties: PMSA represents and warrants that: a. It is a Panamanian corporation validly existing under Panamanian law, with address at P.O. Box 7292, Panama 5, Republic of Panama. b. It has power an authority to enter into this agreement and is the owner of the rights to the est Body of Knowledge which is the subject of this agreement. c. It originally acquired rights pursuant to an agreement of sale and an employment contract dated October 4, 1971, and a termination agreement effective September 1, 1975, the parties to which were PMSA and Werner Erhard, all of which documents have been made available to WELBEHAGEN. d. All of the rights covered by this agreement are valid and subsisting and will be defended by PMSA as to any attack on them. WELBEHAGEN represents and warrants that: a. It is a Netherlands corporation validly existing under Netherlands law and has full power and authority to enter into this agreement. Its address is Bleuhandweg 450, Gouda, the Netherlands. b. All action taken by WELBEHAGEN *138 under this agreement or as a consequence thereof will be defended by WELBEHAGEN as to any attack thereon. Based upon the foregoing premises, the parties agree as follows: 1. The parties define the est Body of Knowledge as consisting of anything and everything developed by Werner Erhard as carried forward and communicated by Erhard Seminars Training, Inc., a California corporation, from October of 1971 to and including August 31, 1975. This shall include all copyrighted material, trademarks and trade names and any and all material related thereto. Generally and not specifically, the est Body of Knowledge is made up in form and substance of the est Standard Training, Graduate Seminars, Guest Seminars, communication and other workshops, and numerous special events, presentations and lectures. The est Body of Knowledge is an educational program involving and consisting of material designed to permit individuals to experience life and living more fully. It is indebted to many thought systems and is a totally new way of looking at reality. The est Body of Knowledge is best identified in the recorded record of the activities of Werner Erhard and his associates from 1971 through *139 August 31, 1975. References to est are intended to be references to the est Body of Knowledge from this point forward. 2. est is growing and developing. It is the intent of the parties that such growth and development shall become the property of WELBEHAGEN hereunder. 3. PMSA will, at its own cost and expense, defend and perfect all aspects of clear and unencumbered title and the right to utilize est throughout the world at any time, and under any circumstances upon reasonable notice from WELBEHAGEN. PMSA will do or cause to be done all things necessary to complete the transfer of all rights (est) to WELBEHAGEN. It is the intent of the parties that there will be supplied to WELBEHAGEN a complete listing and directory of all of the est material, whether or not subject to copyright, trademark or trade name registration. Any est material that may have been registered in the name of someone other than Werner Erhard or PMSA will be placed in a form satisfactory to WELBEHAGEN, at the sole cost and expense of PMSA, on request. It is the understanding of the parties that registration in the name of Werner Erhard is generally the agreed procedure with reference to registration. *140 Erhard Seminars Training, Inc., was at all times a trustee and licensee with reference to est. 4. The parties intend that the Book of Aphorisms, copyrighted by Werner Erhard in 1973, shall be included as part of est. 5. PMSA hereby assigns, sets over and sells to WELBEHAGEN all of PMSA's right, title and interest in and to est. The parties recognize that the value of est must at all times be considered speculative. To this date, the exploitation of est in an economic sense has been largely limited to the United States of America. All economic data with respect to such activities of Erhard Seminars Training, Inc., have been made available to WELBEHAGEN and are warranted by PMSA to be true and correct in all respects. 6. The purchase price for all of the assets conveyed hereunder by PMSA to WELBEHAGEN is fifteen million dollars ($15,000,000) (U.S.). Said sum shall be payable by WELBEHAGEN to PMSA in installments of no less than one million dollars ($1,000,000) (U.S.) per year. Each annual installment shall consist of interest at the rate of nine percent (9%) on such sum as such represent the principal value of licenses disposed of or directly operated by WELBEHAGEN from *141 time to time. No interest shall be paid on any sum in excess of such principal value. WELBEHAGEN may prepay all principal at any time at its own convenience and without the consent of PMSA. So much of any payment as shall not be required for interest shall be attributed to principal. The total of interest actually due shall be the minimum payment to be made by WELBEHAGEN to PMSA for the first four years under this agreement. Commencing with the fifth year, WELBEHAGEN must pay to PMSA at least one million dollars ($1,000,000) (U.S.) a year on account of principal while keeping all interest current. 7. The sole security for the performance required of WELBEHAGEN in terms of payments to PMSA hereunder shall be est. PMSA shall be limited to recovering from WELBEHAGEN sums actually accrued and due and unpaid up to any moment at which PMSA reclaims est. 8. The parties do contemplate the immediate licensing by WELBEHAGEN of rights for the United States of America at a price which should permitWELBEHAGEN to function under this agreement economically PMSA acknowledges that it will be impossible for WELBEHAGEN to make payments beyond those provided for and in the manner provided for *142 until and unless additional territorial licensing or sale by WELBEHAGEN take place for geographical areas other than the United States of America. * * * 10. PMSA acknowledges that it has no direct or indirect claim to the copyrighting of est and that it will cooperate with WELBEHAGEN and Werner Erhard in every respect as to any and all matters relating to ownership or copyright or trademark or whatever else may be required of it. 11. PMSA specifically assigns and sets over to WELBEHAGEN any right, title and/or interest PMSA may have in and to the trademark "est" for which an application is pending in the Patent and Trademark Office of the United States of America. The same is true as to any other trademark or copyright of any kind, however held. * * * 14. Neither party hereto shall assign rights or obligations hereunder to any person or entity without the express written approval of the other party. Approval of assignment shall not be unreasonable [sic] withheld, and any assignee shall expressly assume full liability while not releasing the party having made the assignment, which party shall continue to remain liable. * * * IN WITNESS WHEREOF, the parties have *143 executed this agreement the day and year set opposite their names, to be effective the first day of September, 1975. DATE: PRESENTACIONES MUSICALES, S.A. By: (signed) John R. Cogswell, Attorney-in-Fact M. Chan See, Asst. Secretary WELBEHAGEN INTERNATIONAL, B.V. By: (signed) E.B. van Walsum, MANAGING DIRECTOR A document described as a "Licensing Agreement" effective as of September 1, 1975 was executed by Welbehagen International, N.V. and est, An Educational Corporation and stated, in part, as follows: This Agreement is entered into by and between WELBEHAGEN INTERNATIONAL, B.V., a Notherlands corporation, hereinafter referred to as "WELBEHAGEN", and est, an educational corporation, a Nevada corporation, hereinafter referred to as "est", to be effective September 1, 1975. WITNESSETH:
1. REPRESENTATIONS
The parties contract with reference to the following facts and in reliance upon the following representation: a. WELBEHAGEN represents and warrants that: 1. It is a corporation validly existing under Netherlands law. 2. It is acting within its scope of authority in executing this License. 3. The office of Fursprecher Wolfgang von *144 Erlach in Zurich, Switzerland, has undertaken the establishment of a public tax-exempt foundation to be known as "The Werner Erhard Foundation for est". It is the purpose of said Foundation to engage in educational charitable activities arising out of the est Body of Knowledge. Welbehagen will in due course be owned by a Swiss corporation which will be donated to two Foundations. 4.It has the exclusive right to grant the License which is the subject to this Agreement, limited only as set forth herein. 5. It is contracting herein to carry out the express purposes of Werner Erhard in that it will at all times proceed from responsibility for the broadest possible communication of the Body of Knowledge, as defined below. 6. Its address is Bleulandweg 450, Gouda, the Netherlands. b. est represents and warrants that: 1. It is a corporation validly existing under Nevada law. 2. It has full power and authority to enter into this Agreement. 3. It is solely owned by an educational charitable trust created by Werner Erhard in Jersey, Channel Islands. 4. It is contracting herein to carry out the express purposes of Werner Erhard in that it will at all times proceed from *145 responsibility for the broadest possible communication of the Body of Knowledge, as defined below. 5. It has contractual control of the exclusive services of Werner Erhard and recognizes that such services are critical to Welbehagen and the fundamental realization of the purposes of all persons and entities concerned with the est Body of Knowledge. 6. Its address is 765 California Street, San Francisco, California, 94108, U.S.A.
2. DEFINITIONS
As used herein, the parties define the following words and phrases: a. "Body of Knowledge" includes all of the est material of which Werner Erhard is the source. Such material is reflected in all of the activities of Erhard Seminars Training, a California corporation, which controlled est material from 1971 to August 31, 1975. The Body of Knowledge involves educational materials and methods. These are directed toward the recognition and realization of the ability of each individual to understand his or her experience, to develop a degree of consciousness that will permit better communication and make more meaningful life and living for each individual. The Body of Knowledge further includes ongoing study and research, written, *146 and oral, into the development of processes, lectures, trainings, workshops and/or seminars. b. "Copyright" is used herein as defined by the Uniform Copyright Convention. c. "The Training" is the est Standard Training as it is presently given in the United States of America. Its basic format at present involves the individual trainee in a two-weekend course with a pre-, mid- and post training included therein. d. "Reserved rights" are licenses for any area outside of the United States of America as defined herein. e. "Trademark", as used in this License, refers to the definition of trademark adopted by the particular relevant country. f. "Trainee" refers to the individual participating as a student in the Training. g. "Trainer" is an individual giving The Training who is trained and employed by an entity licensed by Welbehagen to give The Training. h. "U.S." represents the United States of America, its territories and possessions. Included also are any United States military bases where the individuals on such military bases, who receive any benefit out of any provisions relating to this License, are United States military personnel or their immediate families. *147 3. TERM
The Term of this License is for a period of ten (10) years beginning September 1, 1975, and ending August 31, 1985. 4. OPTION TO EXTEND TERM
est shall have the right to extend the term of this License for a further period of five (5) years beyond the expiration of the Term hereon on a first refusal basis. est shall deliver to Welbehagan in writing on or before September 1, 1984, notice that est intends to exercise this option. If the parties cannot agree on the terms for the extension, the arbitration provisions provided for below shall be utilized. 5. AGREEMENT
WELBEHAGEN, for the considerations stated herein, conveys to est an exclusive license to the Body of Knowledge for the U.S.
6. CONSIDERATION
est, in consideration for the License: a. Pay WELBEHAGEN Ten Million Dollars ($10,000,000) (U.S. funds), on or before August 31, 1985. Any unpaid balance shall bear interest at the rate of ten percent (10%) per annum. est may pay WELBEHAGEN interest only for a period not to exceed three (3) years. Thereafter est shall pay WELBEHAGEN no less than One Million Dollars ($1,000,000) (U.S. funds) each year on account of principal while keeping *148 interest current for each year thereafter, with the full balance of principal and interest being due on the last of the term. est shall have the right to prepay any or all of the amount due at any time during the life of this Agreement. b. The Body of Knowledge, specifically including all new material developed during the life of this license, shall at all times be the property of WELBEHAGEN, est's interest therein shall be that of a license only. c. est shall make Werner Erhard available to WELBEHAGEN at any and all times, provided only that all costs (salary, travel, etc.) shall be paid by WELBEHAGEN and that such availability is reasonable under this agreement. WELBEHAGEN must make its own independent arrangements with Werner Erhard. d. est shall not engage in any activities covered by this license outside of the U.S. without the prior written approval of WELBEHAGEN. This limitation shall be considered an express covenant not to compete running for the life of this license and for three years thereafter. e. est shall at all reasonable times confirm publicly the rights of WELBEHAGEN. WELBEHAGEN may request such confirmation and dictate the form thereof, provided WELBEHAGEN *149 shall bear all expenses in connection therewith. 7. PRESENTATION OF THE BODY OF KNOWLEDGE
est shall at all times support, protect and present the Body of Knowledge in a manner consonant with the standards characterizing its presentation to the public to date. est shall at all times meet the current standards as established for the Standard Training, Graduate Seminars, Guest Seminars, Workshops and Special Events. est shall not modify the present program in any substantial detail without the prior written approval of WELBEHAGEN. 8. est STAFF
This is a License, and WELBEHAGEN does not retain any direct or indirect control of est. est shall, however, adopt and maintain employment policies which are responsible and which convey to the general public the sense of integrity that is consistent with the Body of Knowledge. 9. OTHER LICENSEES
WELBEHAGEN reserves all rights to the Body of Knowledge for all areas other than those specifically licensed to est hereunder. WELBEHAGEN will consult with est and/or offer est the right of first refusal wherever there is a potential of direct competition in terms of geographic location or population between the reserved area *150 contemplated to be licensed by WELBEHAGEN and the area in which est is licensed. 10. COOPERATION
It is contemplated that the parties shall be free to develop the Body of Knowledge in all respects. The parties shall communicate on a regular basis conveying the information as to development programs. WELBEHAGEN will communicate to est all information or material which comes to its attention which relates to the Body of Knowledge. The parties shall consider exchanging personnel when convenient from time to time. All programs or material developed by est as the Licensee shall become the property of WELBEHAGEN. est shall have the right to utilize all such program or material without additional charge under this Agreement and without any additional charge for any extended period of this Agreement with reference to the programs or materials developed by est or WELBEHAGEN. WELBEHAGEN shall in any case compensate est for its costs in this area. In return, WELBEHAGEN shall have the right to immediately utilize programs and materials developed by est wherever WELBEHAGEN wishes without additional compensation to est. 11. NEW PROGRAMS OR MATERIAL
The parties acknowledge the *151 value of the contribution of Werner Erhard to est and acknowledge that they will follow the advice of Werner Erhard with reference to implementation of new programs or material in the Body of Knowledge in the U.S. Should Werner Erhard not be available, WELBEHAGEN will suggest changes to est with reference to new programs or material during the life of this Agreement. est shall not be required to follow the suggestions of WELBEHAGEN under such circumstances. * * * 15. WRITTEN PUBLICATIONS
est shall have the right to publish and/or distribute any printed material in any form in the U.S. without prior approval of WELBEHAGEN, provided only that such publication or distribution is consistent with the integrity of the Body of Knowledge. Periodic reports concerning such material or publications shall be made available to WELBEHAGEN, and WELBEHAGEN will do the same for est with regard to material and publications from other license or by WELBEHAGEN itself. Publication or distribution by est of printed material in areas other than the U.S. shall require the prior written approval of WELBEHAGEN. Such approval will not be unreasonable [sic] withheld. Participation in the expenses *152 and profits in areas outside of the U.S. on a reciprocal basis shall be the subject of further mutual Agreement between WELBEHAGEN and est and/or other Licensees. * * * 17. COPYRIGHT
a. Ownership
est acknowledges that WELBEHAGEN and Werner Erhard own and control whatever rights exist to the Body of Knowledge resulting from copyright of all or any portion thereof. Provisions have been made herein above for compensation to est for material which may be developed by est through the life of this Agreement. est hereby expressly waives any rights its [sic] has to such material and will convey all rights to such material to WELBEHAGEN or at WELBEHAGEN's direction to Werner Erhard. est will cooperate with either WELBEHAGEN or Werner Erhard in any further copyrights that may be requested by either. b. Copyright Holder
The parties acknowledge that the Body of Knowledge material has been copyrighted to date in the name of Werner Erhard and in the name of the entity holding current licensing rights to the Body of Knowledge on other occasions. There have been on occasion some errors in copyright by a licensee which should have been in the name of Werner Erhard. est *153 will accept the responsibility for technical correction of any such errors occuring in the past, provided all costs shall be the responsibility of WELBEHAGEN. The parties will act responsibly with regard to any error that may occur in the future. The procedure has been set forth clearly hereinabove so that copyright of basic Body of Knowledge material will normally be in Werner Erhard. The parties acknowledge that day-by-day material not fundamental to the Body of Knowledge may be copyrighted in est. c. Registration and Renewal
est shall copyright and/or renew copyright of any material containing the creative input of the Body of Knowledge in a timely fashion in the name of Werner Erhard or WELBEHAGEN only. WELBEHAGEN or Werner Erhard may so act on their own. The parties shall communicate and cooperate for their mutual convenience in this regard. All costs shall be paid by WELBEHAGEN. * * * 18. TRADEMARK
a. Ownership
The trademark ownership rights belong to WELBEHAGEN. WELBEHAGEN acknowledges that such trademark rights are presently held by est. The parties agree that it is in their mutual interest as a matter of convenience and continuity to have *154 est remain the record holder of the trademark. b. Registration
WELBEHAGEN shall seek trademark registration for "est" together with any service marks which may be appropriate in areas other than the U.S. at its own discretion. est shall register service marks in the U.S. as soon as it is possible to register them. * * * 19. FORMAL CONTINUITY
The parties acknowledge that the continued integrity and form and substance of the Body of Knowledge is of fundamental importance. Form or substantive changes of serious import shall be the subject of prior communication between the parties. est shall as Licensee have ultimate discretion within the U.S. and shall give every thoughtful consideration to the views of WELBEHAGEN on all occasions. * * * 25. WERNER ERHARD
Werner Erhard has been requested to indicate his understanding and approval of this Agreement by becoming a signatory thereto. In no case shall the signature of Werner Erhard be interpreted as making him a party to this Agreement. IN WITNESS WHEREOF, the parties have executed this Agreement, WELBEHAGEN INTERNATIONAL, B.V. By (signed) E. B. van Walsum, Managing Director est, an educational corporation
*155 By (signed) Donald F. Cox (signed) W. Erhard WERNER ERHARD Petitioner ceased its est standard training activities on or about September 1, 1975 and became Twine, Inc., at which time the unamortized license in the amount of $760,000 was reclassified as an account receivable and remained on the books until December 30, 1976 when a transfer of $760,000 from Presentaciones Musicales to Twine, Inc. was made to close the account. In February 1976 Erhard executed the following document: EXCLUSIVE LICENSE
I, Werner Erhard, being the owner of the rights in and to the Body of Knowledge known as Erhard Seminars Training, including, but not limited to the standard training, do hereby confirm the transfer of all of my rights for the period commencing September 1, 1975, through August 31, 1985, to est, an educational corporation. I include the copyright rights and the common law rights owned by me. I intend this document to constitute an exclusive license for the United States of America. I expressly reserve all rights for all other parts of the world. I acknowledge that the consideration for this exclusive license is my employment agreement with est, an educational corporation. *156 I further acknowledge that I undertook to make this exclusive license under an independent agreement with Presentaciones Musicales S.A. I further confirm that Presentaciones Musicales S.A. undertook to see to it that all rights held by it were acquired by est, an educational corporation. * * * (signed) W. Erhard Werner Erhard A document described as an "AGREEMENT WITH REFERENCE TO THE BODY OF KNOWLEDGE KNOWN AS est" dated March 9, 1976 was executed by Erhard, Twine and Presentaciones Musicales and stated in part as follows: This Agreement is entered into by and between Presentaciones Musicales, S.A., a Panamanian corporation, hereinafter referred to as PMSA, and Twine, Inc. (formerly Erhard Seminars Training, Incorporated), a California corporation hereinafter referred to as Twine, and Werner Erhard, an individual, hereinafter referred to as Erhard. WITNESSETH:
WHEREAS, the parties hereto entered into various agreements beginning December 4, 1971, and ending August 31, 1975, and WHEREAS, those agreements related in part to the est Body of Knowledge developed by Erhard, and WHEREAS, those agreements have come to an end, and WHEREAS, Erhard has requested the *157 parties to document their rights clearly with reference to the est Body of Knowledge, and WHEREAS, the parties hereto agree that it was their understanding, and they ratify and approve any acts consistent with this understanding, that the Standard Training should be copyrighted in the name of Werner Erhard alone. THEREFORE, the parties hereto agree that in consideration for the forebearance from suit by each other party, that the Standard Training was properly copyrighted in the name of Werner Erhard on January 16, 1976 * * * On April 16, 1976 Erhard wrote the following letter to Don Cox, president of est, An Educational corporation: * * * It is my understanding that you wish to have for your record a letter indicating my position with reference to the enforcement of any licensing rights est, an educational corporation, has with reference to the Body of Knowledge as to which I hold the federal copyright. est, an educational corporation, is acknowledged by me to be the exclusive licensee for the United States of America of all rights to the material copyrighted by me on January 16, 1976. You shall have the right to take any action with regard to infringements or violations *158 of your license or of the copyright in the same manner as I would have were I acting alone as the sole owner. You may proceed to enforce your rights at any time with or without naming me as a party. I agree to execute any and all documents that may be required to protect your exclusive license. * * * On July 10, 1976 Erhard wrote the following letter to E. B. van Walsum of Welbehagan International, B.V. in the Netherlands: * * * This letter is written to confirm my termination agreement with Presentaciones Musicales, S.A. I did recover the ultimate ownership of the est Body of Knowledge and did so under circumstances which permitted PMSA to make a one-time disposition of est to an entity of my choice or recommendation provided that such entity was ultimately owned and operated for the benefit of the public. Welbehagen, B.V. qualifies. This is, therefore, to confirm to and for you the authority of PMSA to enter into the agreement with you. I have expressly advised PMSA and now advise you that I do not wish to participate in any negotiations nor to have any knowledge of negotiations and I do so on advice of counsel so that there will be no question of the independence *159 of your action. I seek only to have PMSA properly compensated and fully removed from any relationship to est so that there will be no question that est belongs to the world from this point forward. * * * The following materials have been copyrighted on the dates shown in Erhard's name: Title
Date
1. est Standard Training & Lecture
1/15/76
2. Assistant's Training
10/29/73
3.Communication Workshop Diagrams I
7/18/77
4. Living on the Threshold of Experience
3/04/76
5. What is the Purpose of est Training
10/28/76
6. If God Had Meant Man To Fly,
He Would Have Given Him Wings
12/29/73
7. Certainty (Copyright No. C 29015)
Erhard made variations in the presentation of the est standard training since its inception without seeking approval for such changes. At the time of the trial of these consolidated cases in 1983, Erhard was self-employed under the name Werner Erhard and Associates, conducting various programs with major emphasis on the est standard training. Other programs included seminars on communications, integrity, relationships, language, business management and organizational development. 1. Rental Expense Issue
In 1972 petitioner *160 rented space for its business operations in the Franklin House property in San Francisco, California from one Ann Sheehan. Late in 1972 or early in 1973 petitioner decided to purchase the property. On January 31, 1973 Barclays Bank of California made a loan commitment to petitioner in the amount of $98,000 for the purchase of the building and property (the Franklin House) at 1945 Franklin Street, San Francisco, California. The total purchase price of the property was $142,500. On March 30, 1973 a grant deed (executed on March 22, 1973) transferring ownership of Franklin House from Ann Sheehan to petitioner was recorded. Under date of March 30, 1973 petitioner and the Continental Title Company executed a "Holding Agreement" with respect to the Franklin House. A grant deed of the Franklin House from petitioner to Continental Title Company was recorded on September 5, 1974. A letter dated March 30, 1973 from petitioner to Continental Title Company stated as follows: * * * Please accept this letter as authorization to hold the property more specifically described in that certain Holding Agreement dated the 30th day of March, 1973 by and between Continental Title Company, first *161 party, and Erhard Seminars Training, second party, for the benefit of The Maryelle Corporation. The undersigned has authority to and hereby does transfer said Holding Agreement to The Maryelle Corporation, and it is the purpose of this letter to provide you with authority to take instructions from this day forward as to said property from proper representatives of The Maryelle Corporation. * * * Under a "Holding Agreement" dated March 30, 1973 and executed by petitioner and Maryelle Corporation (represented by Michael G. Chatzky, president, and Lois Richmond, secretary) petitioner leased Franklin House from Maryelle Corporation for a 10-year Term at a monthly rental of $3,750. By letter to Continental Title Company dated March 1, 1974 Maryelle Corporation (represented by Michael G. Chatzky, president) authorized the title company to hold the Franklin House property under the Holding Agreement for the benefit of Associated Convalescent Enterprises. By letter dated March 25, 1974 Associated Convalescent Enterprises (represented by Michael G. Chatzky, president) notified petitioner of an increased monthly rental for the Franklin House and by "Modification of Lease" dated April 1, 1974 the *162 monthly rental was increased to $5,000. Payments denominated as rent in the amount of $3,750 a month were made by petitioner to Maryelle Corporation from April 1, 1973 through March 30, 1974. Monthly rental payments of $5,000 were made by petitioner to Associated Convalescent Enterprises from April 1, 1974 through April 30, 1975. In a letter dated March 22, 1977 from Margolis (in the capacity of trustee in liquidation of Associated Convalescent Enterprises), Continental Title Company was notified that Associated Convalescent Enterprises had disposed of its interest in the Franklin House property to est, an educational corporation effective February 1, 1977. In a "Leasehold Agreement" effective June 1, 1981 est, an educational corporation leased the Franklin House property to Erhard doing business as Werner Erhard and Associates for a term of 30 years at a monthly rental of $5,000. On July 1, 1981, Werner Erhard exercised an option to purchase the Franklin House property from est, an educational corporation. 2. Interest expense issue (loans from Antigua Banking Limited)
A series of documents described as demand promissory notes were executed in 1976 to reflect various *163 amounts borrowed by Twine, Inc. on a demand basis from Antigua Banking Limited. The documents, which were signed by Thomas Meehan or Margolis on behalf of Twine, Inc., include the following: Date
Amount
3/05/76
$40,000
4/07/76
60,000
5/17/76
20,000
8/04/76
10,000
8/16/76
2,000
8/23/76
1,000
8/26/76
5,000
9/02/76
5,000
10/15/76
5,000
10/20/76
78,000
10/28/76
1,000,000
11/04/76
2,000
11/18/76
2,500
11/22/76
3,000
12/23/76
460,000
12/23/76
375,000
12/29/76
200,000
Total
$2,268,500
By an "AGREEMENT" dated December 4, 1973 petitioner (represented by Scheaf, president) granted Antigua Banking Limited (represented by Margolis, president) an open line of credit in the amount of $1,000,000. Documents described as promissory notes and executed by Margolis representing the borrower, Antigua Banking Limited, reflect amounts borrowed by Antigua Banking Limited from petitioner in the following amounts: Date
Amount
10/20/75
$500,000
10/24/75
150,000
10/29/75
100,000
12/09/75
590,000
Petitioner's books and records also reflect the following amounts borrowed by Antigua Banking Limited from petitioner: *164 Date
Amount
3/05/76
$1,200,000
3/05/76
90,000
12/30/76
360,000
12/30/76
680,000
12/30/76
200,000
An entry posted on December 31, 1976 to the Loans Receivable account in petitioner's general ledger reflects a loan receivable from Antigua Banking Limited in the amount of $1,040,000. A journal entry (No. 24) dated March 31, 1977 in petitioner's books reflects an offset of loans payable to Antigua Banking Limited in the amount of $820,000 (plus interest) with loans receivable from Antigua Banking Limited in the amount of $833,688 (plus interest). As of May 1, 1977 Antigua Banking Limited owed petitioner the amount of $848,704. 3. Miscellaneous Issues
During the taxable year ended April 30, 1974 petitioner made payments for medical expenses to or for the benefit of Erhard and his wife, Ellen (hereinafter Ellen), in the amount of $1,466. Petitioner incurred expenses of $11,116, $14,558, $22,038 and $17,831 in the taxable years ended April 30, 1973 through 1976, respectively, primarily for Erhard's wardrobe. Laundry and dry cleaning expenses in the amount of $4,426 were also incurred by petitioner in the taxable year ended April 30, 1975 primarily *165 for Erhard's wardrobe. On occasion during the period here relevant petitioner provided meals at the Franklin House for its employees and for members of its volunteer advisory board. Petitioner also conducted special training classes, which included a "wilderness component," for teenagers. The fee for such programs included the cost of meals. Petitioner also conducted training sessions for children between the ages of 6 and 12. Meals were provided by petitioner during these sessions. On its return for the taxable year ended April 30, 1975 petitioner deducted food and beverage expenses in the amount of $24,503 which was disallowed by respondent. Respondent now concedes that $17,967 is deductible. The remaining $6,536 represents one-half of the deduction of $13,072 claimed by petitioner for food and beverage expenses pertaining to the office of Werner Erhard, a division of petitioner's organization. On its return for the taxable year ended April 30, 1976 petitioner deducted food and beverage expenses in the total amount of $28,457, with $19,257 of this amount claimed under cost of goods sold and $9,200 claimed under other deductions. Respondent disallowed these deductions *166 in full. It was the policy of petitioner to reimburse employees who were required to submit an accounting of the expenses (including automobile expenses) incurred by them. On its return for the taxable year ended April 30, 1976 petitioner claimed a deduction for automobile expenses in the amount of $8,558 which respondent disallowed in full. In 1973 Erhard and his administrative assistant, Charles Ingrasci (hereinafter Ingrasci), traveled to India. The entire trip lasted three or four weeks, with a few days spent in Hawaii. One of the purposes for the trip to India was to obtain material for lectures and to continue the development of the work carried on by petitioner. Erhard and Ingrasci met with religious and educational leaders in India. Some of the gifts purchased in India were given to various individuals in India and some of the gifts were given to members of the EST organization and other individuals associated with the EST organization. Among the purchases made on the trip were clothing and other personal items (i.e., camera equipment) as well as gifts and various art objects. Petitioner claimed a deduction for travel and entertainment on its return for the taxable *167 year ended April 30, 1973 in the amount of $106,655 which included $2,594 with respect to the trip to India and $4,794 with respect to two around-the-world airline tickets for Erhard and Ingrasci. Respondent disallowed the deduction claimed for the trip to India and the world trip.Petitioner also claimed a deduction for gift and entertainment expenses on its return for the taxable year ended April 30, 1973 in the amount of $33,987. It is stipulated that, of this total, "$1,447.13 pertained to gifts, and $5,793.68 pertained to a trip to India by Werner Erhard." The stipulated amounts were disallowed by respondent. On September 28, 1973 petitioner's Board of Directors adopted the following resolution: * * * WHEREAS, it is vital to the growth of est to expand beyond the boundaries of the continental United States; and WHEREAS, in furtherance of this interest Werner Erhard will be speaking in Europe and will be meeting with important personages in Europe to lay the foundation for further development of est; and, WHEREAS, it is deemed necessary to have preliminary arrangements made for said speaking engagements and meetings, RESOLVED, that Ellen Erhard be sent to London, England; *168 Paris, France; Rome, Italy and Lindau and Munich, Germany to make arrangements for Werner's trip. RESOLVED FURTHER, that $4,000 be advanced to Ellen to cover the expenses of said trip and that she be given any additional funds which she deems necessary to accomplish the objective of her trip if further funds are necessary. Dated: September 28, 1973 (signed) W. Erhard Werner Erhard (signed) K. Laurel Scheaf K. Laurel Scheaf (signed) Harry Margolis Harry Margolis Ellen accompanied her husband on a trip to various European cities at some time during petitioner's taxable year ended April 30, 1974. The purpose of the trip was to give lectures, establish business relationships, obtain endorsements and explain the work of est. Petitioner claimed a deduction for travel and entertainment expenses on its return for the taxable year ended April 30, 1974 in the amount of $136,432, which amount included expenses of Ellen in the amount of $4,868.39. Respondent disallowed one-half of the deduction claimed for Ellen's expenses. OPINION 1. Amortization of Licensing Agreement
In 1971 Erhard, then an instructor for Mind Dynamics, decided to pursue a new activity including *169 certain concepts which he originated and which are described herein as the Body of Knowledge. [3] He consulted with Margolis, an attorney, and other members of the Margolis law office and it was decided to use an existing shell corporation (Saratoga) for the new enterprise. On October 4, 1971 the corporation resolved to do business under the name of Erhard Seminars Training (petitioner). [4] On the same date Erhard executed an "Agreement of Sale" which recited the sale of certain "processes, methods and procedures" to Presentaciones Musicales, a Panamanian corporation, for $1,000,000 and on the same date executed an "Employment Agreement" with Presentaciones Musicales. [5] On December 4, 1971, petitioner and Presentaciones Musicales executed a "License Agreement" which recited that Presentaciones Musicales granted to petitioner an exclusive 10-year license in the United States for the above "processes, methods and procedures" for $1,200,000. Petitioner claimed amortization deductions in each of the taxable years ended April 30, 1972 through 1976 with respect to the license in the respective amounts of $40,000, $120,000, $120,000, $120,000 and $40,000. Respondent disallowed the deduction *170 in full. *171 Respondent contends that the purported sale of the Body of Knowledge by Erhard in 1971 to Presentaciones Musicales and the subsequent 10-year license from Presentaciones Musicales to petitioner (as well as the subsequent partial repurchase of the license by Presentaciones Musicales in 1973, the resale of the Body of Knowledge in 1975 by Presentaciones Musicales to a Netherlands Corporation and the subsequent peregrinations of the Body of Knowledge) were sham transactions which must be disregarded for tax purposes. It is an established principle that for tax purposes the substance of a transaction controls over its form, Gregory v. Helvering,293 U.S. 465 (1935), and that where the sole purpose of a transaction is to obtain tax deductions, it will not be given effect for tax purposes. Knetsch v. United States,364 U.S. 361 (1960). While a taxpayer has the right to minimize his taxes by whatever means the law permits, this right does not bestow upon the taxpayer the right to structure paper arrangements that do not stand on the solid foundation of economic reality. Cf. Zmuda v. Commissioner,79 T.C. 714, 719 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). *172 While the structure of the arrangements may reflect ingenuity and imagination, "we must not be beguiled by such ingenuity -- we must pursue the 'paper chase' to ferret out the substance of the arrangements to determine the proper tax treatment." Estate of Helliwell v. Commissioner,77 T.C. 964, 983 (1981). We have carefully considered the record and we must conclude that the "sale" of the "processes, methods and procedures" by Erhard to the Panamanian corporation and the subsequent "license" of such "processes, methods and procedures" obtained by petitioner from the Panamanian corporation for $1,200,000 was completely without substance and served no purpose or utility apart from their anticipated tax consequences. Erhard, who originated the Body of Knowledge, was unable to elucidate any valid business purpose whatever for the decision to first sell his concept for $1,000,000 to a foreign entity (which was unknown to him at the time) and then to pursue his new endeavor under a license granted by Presentaciones Musicales to Erhard Seminars Training and under an employment contract that came to petitioner via Presentaciones Musicales. [6] There is no evidence of the *173 consideration prompting the parties in the "sale" agreement to place a value of $1,000,000 (and a guarantee of $6,000,000 in gross income) on the embryo Body of Knowledge in 1971. Moreover, the spurious nature of the sale is underscored by the fact that the sale price of $1,000,000 was never paid to Erhard. Nor is there any indication in the record of any valid considerations that led to the figure of $1,200,000 for the 10-year license of the Body of Knowledge obtained by petitioner from Presentaciones Musicales. The illusory nature of the license is further demonstrated throughout the years here in issue by the actions of the parties involved. Initially, it appears that petitioner began to conduct est standard training sessions some time in October 1971, well before the date of the license agreement with Presentaciones Musicales. Under an agreement dated 1973 Presentaciones Musicales reacquired from petitioner a portion of the exclusive license rights for $4,166.66 per month for the balance of the original 10-year license term. Yet petitioner inexplicably continued to amortize the license as before at the annual rate of $120,000. [7]Erhard, whose concepts were at the core of *174 all these agreements, repeatedly displayed unfamiliarity with key features of said agreements. His lack of awareness extended even to his own employment agreement which set forth various detailed terms and mutual obligations which, insofar as the record shows, were virtually ignored by the parties. The chimerical nature of these transactions is further underscored by the mosaic of transactions which took place when petitioner ceased operations in September 1975. On September 1, 1975 Presentaciones Musicales and Erhard executed a "Termination *175 Agreement" terminating the agreement of sale and the employment agreement of October 4, 1971 and on the same date Presentaciones Musicales executed an agreement purporting to again sell all of its "right, title and interest" in the Body of Knowledge to Welbehagen, a Netherlands corporation, for $15,000,000. Thereupon, est, an educational corporation (the Nevada corporation formed on or about September 1, 1975 with virtually all of the same management, employees and training facilities as petitioner) immediately obtained a 10-year license for the Body of Knowledge for $10,000,000. Initially, it appears that Presentaciones Musicales was selling an asset it did not then own. The September 1975 "Termination Agreement" terminated the agreement of sale and the employment agreement of October 4, 1971. Since the October 4, 1971 agreement of sale explicitly recited that the termination of either agreement (i.e., the agreement of sale or the employment agreement) would automatically terminate the other agreement, it would appear that the asset which was purportedly sold by Erhard to Presentaciones Musicales simply reverted back to Erhard. It is also difficult to reconcile these events with *176 a subsequent "Exclusive License" in February 1976 in which Erhard, as "owner of the rights in and to the Body of Knowledge known as Erhard's Seminars Training" purported to transfer such rights to est, an educational corporation. [8] In short, it does not appear that Erhard ever parted with or diminished his control over the Body of Knowledge. The denouement of these various transactions involving the Body of Knowledge is that in 1981 Erhard, now self-employed, was presenting his est standard training and the various seminars under the name of Werner Erhard and Associates. It is clear on this record that the various agreements and transactions discussed above were utterly without economic reality and substance and that the sole purpose of this elaborate paper facade was to obtain tax deductions. Consequently these transactions will not be given effect for tax purposes. Cf. Knetsch v. United States,364 U.S. 361 (1960). We conclude therefore that *177 petitioner is not entitled to amortization deductions with respect to the alleged license engendered by these transactions in each of the taxable years ended April 30, 1972 through 1976. Respondent is sustained on this issue. 2. Interest on alleged indebtedness to International Aesthetics and Antigua Banking Limited
Our conclusion that the licensing agreement as well as the other agreements were devoid of economic substance also impugns the validity of the purported loans created with the ostensible purpose of carrying out such agreements and the related "interest" expense deductions here in dispute. [9] In connection with its "License Agreement" of December 4, 1971, petitioner purportedly obtained a loan of $1,000,000 from International Aesthetics. [10] The loan was arranged through Margolis. Inexplicably, Erhard executed two notes dated December 14, 1971, each for $1,000,000, payable to International Aesthetics, one of them on a pre-printed form designated as "Note Number 1" and the other a typewritten version. It does not appear that any security arrangement was made for the loan. The typewritten version charts the subsequent assignment of the note from International *178 Aesthetics to Presentaciones Musicales (on February 28, 1974), then from Presentaciones Musicales to World Entertainers (on March 4, 1974) and to Antigua Banking (on March 12, 1974). Neither Erhard nor Scheaf appears to have any independent knowledge of the circumstances surrounding the loan. The manner in which the loan was structured is also illuminating. It appears that on December 14, 1971 the lender, International Aesthetics, executed a note in favor of Associated Arts for $6,911,835 and the following day (December 15, 1971) International Aesthetics opened a checking account with the Union Bank (Wilshire Center, regional head *179 office) in Los Angeles with a deposit of $7,000,000. On the same date this account was charged with several charges in the total amount of $7,000,000, including an unexplained charge of $1,200,000. In a letter dated December 14, 1971 Scheaf, representing petitioner, authorized the Union Bank (Wilshire Boulevard at Western) to transfer $1,200,000 to Presentaciones Musicales. The record also shows that petitioner opened a checking account with the Union Bank in San Jose with a deposit of $1,200,000 and withdrew this same amount on the same day. Yet, the record also indicates that an account charge issued by the Union Bank shows that this amount was remitted to a bank account of Presentaciones Musicales in Curacao, Netherlands Antilles on December 15, 1971. In any event, it appears that the capital stock of International Aesthetics was acquired by Associated Arts on December 14, 1971 and that the stock of International Aesthetics held by Associated Arts was acquired by Presentationes Musicales on June 21, 1973. The close relationship of these entities, which are sometimes described as "system entities" controlled directly or indirectly by the Margolis law office and used by it to *180 implement tax planning, underscores the circular and economically meaningless paths of both the loan proceeds and the promissory note initially executed by Erhard for petitioner. In a comparable situation this Court refused to recognized a circular movement of funds as creating a valid debtor-creditor relationship. See Karme v. Commissioner,73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). We find on this record that the purported loans to petitioner from International Aesthetics were without economic substance and did not create a valid debtor-creditor relationship. Hence, petitioner may not deduct any amount paid as interest to International Aesthetics during the period here involved. We reach the same result with respect to the interest paid in connection with the purported loans from Antigua Banking Limited, which was an entity controlled by Margolis. Again we have the same pattern of money transfers and note exchanges, purportedly legitimized by meticlous book entries, which bear no vestige of economic substance. Inexplicably, petitioner purportedly borrowed some $2,268,500 (evidenced by a series of demand notes from Antigua Banking *181 Limited which in turn borrowed some $3,870,000 from petitioner). It appears that these loans were generally unsecured. On occasion, the purported loans would even cross paths, with loans going both ways on the same date. We do not believe that this busy shuttle of documents establishes a genuine indebtedness between the parties involved. cf. Karme v. Commissioner,supra.The fact that appropriate book entries were made is not controlling. Glasgow Village Development Corp. v. Commissioner,36 T.C. 691 (1961). Nor does the mere movement of funds between the entities under these circumstances constitute a substantive transaction for tax purposes. The transactions here involved are completely devoid of economic reality and it readily appears that they have no economic significance beyond expected tax benefits. We conclude that the purported indebtedness was not genuine and therefore petitioner is not entitled to any deduction as interest under section 163 for the amount paid. 3. Wardrobe Expenses
Respondent disallowed deductions claimed by petitioner in the taxable years ended April 30, 1973 through 1976 for certain wardrobe expenses *182 in the respective amounts of $11,116, $14,558, $22,038 and $17,831 and also disallowed a deduction claimed by petitioner in the taxable year ended April 30, 1975 for laundry and dry cleaning expenses in the amount of $4,426. The expenditures were incurred by petitioner primarily for Erhard's wardrobe. We do not believe that the wardrobe and wardrobe maintenance expenses incurred by petitioner constituted ordinary and necessary business expenses within the meaning of section 162(a). To qualify as business expenses under section 162(a), the expenditures in question must be directly connected with or pertaining to the taxpayer's trade or business. Section 1.162-1(a), Income Tax Regs. Here, the expenditures in issue were purportedly incurred pursuant to the employment contract of October 4, 1971 between Erhard and Presentaciones Musicales (which contract was then assumed by petitioner) and executed concurrently with the agreement of sale of the Body of Knowledge by Erhard to Presentaciones Musicales. Under the so-called employment agreement, petitioner agreed to provide Erhard with an initial wardrobe allowance of $5,000 and to provide him with a monthly clothing budget of $500. We *183 have concluded above that the various agreements and transactions beginning with the initial agreements of October 4, 1971 between Erhard and Presentaciones Musicales lacked economic reality and may be disregarded for tax purposes. Consequently, the terms of the employment contract itself (which came to petitioner via Presentaciones Musicales) provide little support for petitioner's contention that the expenditures for Erhard's wardrobe constitute ordinary and necessary business expenses under section 162(a). To prevail, petitioner must show that the expenditures were directly connected with or pertained to petitioner's business. Kornhauser v. United States,276 U.S. 145, 153 (1928) (for purposes of section 162, the expense must bear a direct and proximate relationship to the taxpayer's trade or business); section 1.162-1(a), Income Tax Regs. Petitioner's contention that the wardrobe expenses were undertaken for the business and not for the personal benefit of the employee is unpersuasive. There is no perceptible connection between the continuous expenditures over the years for Erhard's wardrobe and the business in which petitioner was engaged. The wardrobe expenses *184 incurred by petitioner for Erhard consisted of ordinary, conventional items of clothing, i.e., shirts, slacks, jackets, sweaters, and shoes, which were undeniably suitable for general or personal wear. It is evident on this record that the expenditures neither benefited nor were intended to benefit the petitioner's business activities. The steady acquisition of this wardrobe over a period of some four years at considerable expense strongly suggests that the expenditures were geared to and dictated by Erhard's personal needs rather than the purported exigencies of petitioner's business. In any event, the requisite nexus between the wardrobe expenditures and petitioner's trade or business has not been established. See Commissioner v. Heininger,320 U.S. 467 (1943). We conclude on this record that the wardrobe and wardrobe maintenance costs incurred throughout the period involved may not be deducted by petitioner as ordinary and necessary business expenses under the provisions of section 162(a). 4. Medical Expenses
Petitioner claimed a deduction in the taxable year ended April 30, 1974 for medical expenses for the benefit of Erhard and his wife Ellen in the *185 amount of $1,466 which was disallowed by respondent. To qualify as an ordinary and necessary expense under section 162(a), the expense must bear a direct relationship to the taxpayer's trade or business, i.e., it must be appropriate and helpful to the taxpayer's trade or business. See Commissioner v. Heininger,320 U.S. 467 (1943); see also section 1.162-1(a), Income Tax Regs. The necessary relationship does not exist here. Petitioner's reliance on the so-called employment contract to qualify this deduction as a business expense is unpersuasive. Moreover, petitioner's effort to categorize this expense as a payment under a medical plan of the employer (see section 105(b)) is simply not supported by the record. Petitioner's argument that Erhard would not have accepted employment unless his wife and children received assurance of adequate medical care provides no support for the deductibility of this expenditure. See J. Gordon Turnbull, Inc. v. Commissioner,41 T.C. 358, 378 (1963), affd. 373 F.2d 87 (5th Cir. 1967). We conclude on this record that petitioner is not entitled to a deduction for the medical expense incurred in the amount *186 of $1,466 in the taxable year ended April 30, 1974. 5. Food and Beverage Expenses
Petitioner claimed a deduction for food and beverage expenses in the taxable year ended April 30, 1975 in the amount of $24,503 (which included food and beverage expenses pertaining to the office of Erhard in the amount of $13,072). Respondent has stipulated that $17,967 of the amount claimed by petitioner is deductible. The remaining $6,536 still in dispute represents one-half of the $13,072 expenditures pertaining to the office of Erhard. Petitioner claimed a deduction for food and beverage expenses in the taxable year ended April 30, 1976 in the amount of $28,457, of which $19,257 was claimed under cost of goods sold and $9,200 was claimed under other deductions. Respondent disallowed a deduction for the entire amount of $28,457. Petitioner has the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). With respect to the taxable year ended April 30, 1975, petitioner made no serious effort to show that it was entitled to any deduction for food and beverage costs in excess of the amount ($17,967) allowed by respondent. We therefore sustain respondent *187 with respect to the taxable year ended April 30, 1975. With respect to the taxable year ended April 30, 1976, there is evidence in the record as to the general practice followed by petitioner of providing food and beverages to its employees throughout the period here involved and also to pay for staff luncheons on the business premises of the petitioner. We believe that the business necessity for making these expenditures was clearly dictated by the method of operation adopted by petitioner to conduct its unique activities. It also appears that petitioner conducted training sessions for children and that food and beverages were necessarily provided for the children during the sessions and included as part of the tuition. The special training sessions for teenage children included a "wilderness component" which lasted from six to ten days. It also appears that some portion of these expenditures was for the office of Erhard which apparently was regarded as a division within petitioner's corporate structure. The evidence shows that detailed records were kept by petitioner for these various expenditures. We believe that petitioner has convincingly established both the business necessity *188 of these expenditures and the amount of the expenditures incurred for food and beverages. We hold on the basis of this record that petitioner is entitled to a deduction for food and beverage expenses incurred in the taxable year ended April 30, 1976 in the total amount of $28,457. 6. Business Expenses: Automobile, Travel and Entertainment
Petitioner claimed a business expense deduction under section 162(a) for automobile costs in the taxable year ended April 30, 1976 in the amount of $8,558 which was disallowed by respondent. Certain employees of petitioner were allowed expense accounts in connection with their duties and they were required to submit periodic and detailed accountings to petitioner. Upon verification, the employees would be reimbursed for such expenses. The record shows that petitioner maintained meticulous records identifying the employees involved, the amounts of the reimbursements and the geographical area involved. On this record, we conclude that petitioner is entitled to a business expense deduction under section 162(a) for the taxable year ended April 30, 1976 for automobile expenses in the amount of $8,015. Petitioner deducted $106,655 for travel *189 and entertainment in the taxable year ended April 30, 1973. Included in this amount are (1) the expenditures of $2,594 incurred by Werner Erhard on a trip to India and (2) the cost of two around-the-world airplane tickets ($4,794) for Erhard and Ingrasci. Both of these items are in dispute. Also in the taxable year ended April 30, 1973 petitioner deducted $33,987 for gift and entertainment expenses. Of this amount respondent disallowed $5,739.58 pertaining to Erhard's trip to India and $1,447.13 which pertained to gifts generally. In 1973 Erhard and Ingrasci, who was employed by petitioner as an administrative assistant to Erhard, traveled to India for a period of three or four weeks, with some three or four days in Hawaii.They also embarked on a world trip sometime in 1973. Petitioner has the burden of showing that the trip related primarily to its trade or business. Section 1.162-2, Income Tax Regs.; Rudolph v. United States,370 U.S. 269 (1962). The testimony with respect to the Indian trip is extremely vague and replete with broad generalities. The visits to individuals in India who were in some way versed in aspects of Indian philosophy appear to be incidental *190 in nature. We have carefully considered the record and we are persuaded that the trip to India was primarily personal in nature. Petitioner has failed to establish the requisite nexus between the trip to India and its trade or business. We reach the same conclusion with respect to the around-the-world airplane tickets for Erhard and Ingrasci since the record is virtually silent as to the purpose of such trip. We hold that petitioner is not entitled to a deduction for the expenditure of $2,594 incurred by the two individuals on the trip to India and further, that petitioner is not entitled to a deduction for the world-trip tickets in the amount of $4,794. Erhard and Ingrasci purchased numerous gifts, some for individuals they visited in India but mostly for friends in the United States. They also made expenditures for personal clothing and they acquired numerous objects including such items as old ivory pieces, antique plates and jars, old coins and a copper buddha statue. The evidence is extremely vague as to the number of recipients of gifts in India. Ingrasci could not recall the disposition of some items of significant value which were purchased in India. We are unable *191 to find on the basis of this unsatisfactory record that the gifts were intended for or served any business purpose. Nor is there any meaningful effort to present any evidence with respect to the category for gifts and entertainment in the amount of $1,447.13. Moreover, petitioner has failed to meet the requirements of section 274(d) which sets forth stringent substantiation requirements in order to qualify expenditures of this nature for deductibility under section 162(a). We hold therefore petitioner is not entitled to a business expense deduction under section 162(a) for the gift expenditures involved. Petitioner claimed a business expense deduction for travel and entertainment for the taxable year ended April 30, 1974 of $136,432 which amount included $4,868.39 representing expenses incurred by Ellen on a trip to Europe. Respondent disallowed one-half of the $4,868.39 deduction claimed with respect to Ellen's expenditures. Petitioner has the burden of proof. Rule 142(a). Ellen accompanied her husband on a trip to Europe in the taxable year ended April 30, 1974. The expenditures in question are not deductible unless it can be adequately shown that her presence on the trip *192 had a bona fide business purpose. Section 1.162-2(c), Income Tax Regs.; cf. Silverman v. Commissioner,28 T.C. 1061 (1957), affd. 253 F.2d 849 (8th Cir. 1958). It must be shown that she provided substantial service directly related to the petitioner's business. See Weatherford v. United States,418 F.2d 895 (9th Cir. 1969). Erhard testified generally as to the purposes of the trip to Europe and, with respect to Ellen's presence on the trip, he alluded to secretarial duties but stated that the real reason was to provide "a sense of family" which would somehow inure to the benefit of petitioner. We have considered the record as a whole, including the self-serving resolution of petitioner's board of directors authorizing Ellen to go on the trip, and we are unpersuaded that Ellen's presence on the trip was dictated by the exigencies of petitioner's business. The purported benefits to petitioner are simply too incidental and tenuous to cause her expenses to qualify as deductible business expenses. We hold that petitioner is not entitled to a business expense under section 162(a) in the taxable year ended April 30, 1974 for any expenses *193 incurred by Ellen on the trip to Europe in excess of the amount allowed by respondent. 7. Rental Payments
In 1972 petitioner rented space for its business operation in the property hereinafter referred to as the Franklin House in San Francisco, California from one Ann Sheehan. Late in 1972 or early in 1973 petitioner decided to buy the property for $142,500 and on January 31, 1973 obtained a real estate loan commitment from Barclays Bank of California in the amount of $98,000. On March 30, 1973 a grant deed (executed on March 22, 1973) transferring ownership from Ann Sheehan to petitioner was recorded. At this point a series of purported transactions took place, all under date of March 30, 1973; (1) Scheaf (on behalf of petitioner) and one Lee Neuhaus (on behalf of the Continental Title Company) executed a Holding Agreement reciting that title to the Franklin House property was conveyed by petitioner to the Continental Title Company to be held for petitioner and subject to petitioner's instructions; (2) petitioner authorized Continental Title Company to hold the Franklin House property under the Holding Agreement for the benefit of the Maryelle Corporation; and (3) petitioner *194 thereupon leased the Franklin House from the Maryelle Corporation for a 10-year period at a monthly rental of $3,750. [11] On March 1, 1974 Maryelle Corporation authorized Continental Title Company to hold the Franklin House property for the benefit of Associated Convalescent Enterprises. On April 1, 1974 Associated Convalescent Enterprises and petitioner executed a modification of the lease under which the monthly rental was increased to $5,000. Petitioner claimed rental expense deductions in the taxable years ended April 30, 1974 and 1975 with respect to the Franklin House property in the respective amounts of $41,250 and $60,000 which were disallowed by respondent. Section 162(a)(3) allows a deduction for rental payments required to be made for the business use of property. It is incumbent upon us to determine whether the arrangements involved were in fact bona fide. In *195 Falsetti v. Commissioner,85 T.C. 332, 347 (1985) this Court defined a "'sham in substance' as the expedient of drawing up papers to characterize transactions contrary to economic realities and which have no economic significance beyond expected tax benefits." Economic realities govern over the form in which a transaction is cast. See Gregory v. Helvering,293 U.S. 465 (1935); cf. Zmuda v. Commissioner,79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). After careful consideration of the entire record, we conclude that the arrangements to move the title in the Franklin House to Continental Title Company and then to authorize Continental Title Company to hold said title for the benefit of Maryelle Corporation and then for Associated Convalescent Enterprises were completely devoid of economic reality and will not be given effect for tax purposes.[12] Scheaf, who executed several of the documents here involved in her capacity as petitioner's president, appeared thoroughly unfamiliar with the transactions involved and with the reasons for entering such transactions. She did not know how the monthly rental payments *196 of $3,750 was arrived at. Nor did she know the reasons for the subsequent increase of the monthly rental from $3,750 to $5,000 in spite of the fact that she signed both the original 10-year lease and the modification of said lease. Moreover, the economic artificiality of the grossly inflated monthly rentals is underscored by the testimony in the record from a witness who was long involved in the real estate business, was thoroughly familiar with the rental of property in the San Francisco area, knew the area of the Franklin House and was familiar with the actual property hereinvolved. The economic or business rationale for the sudden designation of Maryelle Corporation and, later, Associated Convalescent Enterprises as the entities for whose benefit the Franklin House was held by Continental Title Company remains unexplained except to play the role of "lessors" of the Franklin House property. There is nothing in the record to explain the derivation or the nature of the interest in the property by these two entities. It is significant that both of these entities were among the so-called "system entities" managed by individuals from the office of Margolis. There is no effort to *197 explain why (apart from tax considerations) petitioner, which had just acquired the property with a loan from Barclays Bank of California, [13] would immediately embark on a transaction which did nothing except to engender an onerous (and inflated) monthly rental liability. The subsequent events involving the Franklin House property are also revealing with respect to the true ownership of the Franklin House property throughout this period. By letter dated March 22, 1977, Margolis informed Continental Title Company, which ostensibly was holding title to the Franklin House property for the benefit of Associated Convalescent Enterprises, that Associated Convalescent Enterprises had disposed of its interest in the property on February 1, 1977 to a Nevada corporation known as est, an educational corporation. Est, an educational corporation, had been formed on or about September 1, 1975 and continued the standard training previously conducted by petitioner, with substantially the same management, employees and training facilities used by petitioner. On June 1, 1981 est, an educational corporation, leased the Franklin House property for a period of 30 years to Erhard doing business as *198 Werner Erhard and Associates and a month later Erhard, doing business as Werner Erhard and Associates, exercised an option to purchase the Franklin House property. We hold on the basis of this record that, in view of the absence of any economic reality or business purpose in the transactions above described, petitioner is not entitled to a deduction for rental payments in the taxable years ended April 30, 1974 and 1975 in the respective amounts of $41,250 and $60,000. 8. Additions to Tax
Respondent determined that petitioner is liable for the additions to tax under section 6653(a) for the taxable years ended April 30, 1972 through 1975. Section *199 6653(a) imposes an addition to tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Petitioner has the burden of proof. Bixby v. Commissioner,58 T.C. 757, 791 (1972). Petitioner has made no serious effort to prove that the respondent's determination is erroneous and has not addressed this issue on brief. Under the circumstances we sustain respondent's determination as to the additions to tax. Decisions will be entered under Rule 155 upon the disposition of the severed partnership issues.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure, as amended, unless otherwise noted.↩
2. In the relevant statutory notices of deficiency, respondent disallowed an investment credit of $749 claimed by petitioner in the taxable year ended Apr. 30, 1973 and also disallowed net operating loss deductions claimed by petitioner in the taxable years ended Apr. 30, 1974 and 1975 in the respective amounts of $19,868 and $26,661. Petitioner presented no evidence or argument with respect to these issues at the trial and hence said issues must be deemed conceded by petitioner. See Rule 142(a).↩
**. This amount represents gross income for the period of 5/1/75 through 8/31/75.↩
3. It appears that the concepts, or "know-how" contained in the so-called Body of Knowledge were imparted through the est standard training. The est standard training was a 52 to 60-hour session held two consecutive weekends with groups of 200 to 250 trainees. The sessions were conducted by individuals who qualified as "Trainers." From the inception of the training session late in 1971 through at least the year 1972, Erhard personally conducted all the sessions. Additional trainers, all selected by Erhard, were developed through 1975. Between 1971 and 1975 Erhard also developed other programs, including communication workshops, the relationship program and graduate seminars. Tuition or fees were charged by petitioner for attendance at the est standard trainings, workshops, lectures and other activities. Erhard testified that a goal of est standard training was to enable individuals to be "more in charge of the quality of their life." He also described the est standard training as "know-how which we pass on to people about what to do to have the ability to make their lives work for them more effectively show up in their lives." He further explained that the know-how was not a mere recipe or prescription, but a finding in one's self, a discovering in one's self, an ability that one had not been aware of before, so that the results of the training showed up in people's life, not like a prescription, but like an ability to be in life and to deal with certain things in life that was not there before . . . the training is not a philosophy, but it really enables people, like gives them the know-how to deal with what their philosophy is and the ability to create for themselves a more effective philosophy in their lives . . . the training delivers to people the know-how to open up that aspect of their life that makes life really present for them, instead of living more like a concept . . . See generally est of Hawaii v. Commissioner,71 T.C. 1067 (1979), affd. without published opinion 647 F.2d 170↩ (9th Cir. 1981). 4. It was not until Nov. 1972 that a stock certificate was issued by petitioner to its stockholder International Aesthetics, a corporation managed in the Margolis law office. Subsequent transfers of petitioner's stock were from International Aesthetics to California Aesthetics and from there to Presentaciones Musicales (on Nov. 23, 1976). We note that neither Erhard nor Scheaf, at one time petitioner's president, was able to shed much light on these transfers of petitioner's stock. ↩
5. The "Agreement of Sale" made reference to the "Employment Agreement" and recited that the termination of either agreement "shall automatically and simultaneously terminate the other agreement."↩
6. In fact, Erhard testified that "I can't tell you what I asked him [Margolis] to accomplish with the sale of the Body of Knowledge." ↩
7. When petitioner ceased its est standard training activities on or about Sept. 1, 1975 and became Twine, Inc., the unamortized license in the amount of $760,000 was reclassified as an account receivable and remained on the books until Dec. 30, 1976 when a transfer of $760,000 from Presentaciones Musicales to Twine, Inc. was made to close the account. It should be noted that Presentaciones Musicales at that time owned all the stock of Twine, Inc., a corporation managed from the Margolis law office.↩
8. It further appears on the record that Erhard obtained copyrights in his name on various material related to the Body of Knowledge, including a copyright dated Jan. 15, 1976 to "est Standard Training & Lecture."↩
9. It is stipulated that the interest expense deductions disallowed by respondent and remaining in dispute are as follows: ↩
Taxable year ended
Amount
4/30/72
$38,651
4/30/73
99,618
4/30/74
92,986
4/30/75
45,517
4/30/77
556,330
10. On Dec. 14, 1971 petitioner's board of directors authorized Erhard, as chairman of the board, and Scheaf, as president, to borrow this amount from International Aesthetics. However, the record shows that Erhard and Scheaf were not elected to the above corporate offices until June 23, 1972.↩
11. Petitioner contends that, under California law, the effect of its Mar. 30, 1973 letter to Continental Title Company authorizing Continental Title Company to hold the Franklin House for the benefit of Maryelle Corporation was to transfer equitable title to the Franklin House to Maryelle Corporation.↩
12. In view of our conclusion that the transactions involving the Franklin House property were simply paper transactions without economic validity, there is no need to explore the legal ramifications of the ownership of real property pursuant to holding agreements under California law. ↩
13. Soon after the initial spate of transactions invoking the transfer of title to the Franklin House property, Barclays Bank of California made it clear to petitioner that such transactions would in no way affect the outstanding deed of trust.↩